TWIN CITY FIRE INSURANCE
COMPANY, Plaintiff–
Appellee,

v.

COUNTRY MUTUAL INSURANCE
COMPANY, Defendant–
Appellant.

No. 93–2684.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 18, 1994.

Decided May 5, 1994.

Richard A. Ryan (argued), Michael D. Hultquist, McCullough, Campell & Lane, Chicago, IL, for plaintiff-appellee.

John J. Foley (argued), Jennifer A. Luffman, Foley & Associates, Chicago, IL, for defendant-appellant.

Before POSNER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

Out of a ghastly accident in 1983 grew a dispute between two liability-insurance companies that was litigated in a federal district court in Illinois under the diversity jurisdiction, resulting in a jury verdict for one of the insurance companies, Twin City, for $336,000, and an appeal by the other, Country Mutual. The accident came about as follows. A school bus owned by an Illinois school district and driven by an employee of the district, Nelma White, collided with an automobile carrying four teenage boys—Larry Hoogstraten (the driver), Paul Jacobsma, Ron Stogin, and Larry Faron. The automobile passed under the chassis of the bus, came out on the other side, and hit an automobile driven by Ron Anderson. Faron was injured, as was Anderson (there were no passengers in Anderson's car). Hoogstraten and his other two passengers were killed. Both injured victims, and the representatives of the three victims who had been killed, brought tort suits in an Illinois state court against the school district. All but Hoogstraten's representative also sued Hoogstraten's estate. Country Mutual had insured the school district for liability up to $1 million, and Twin City had insured the district for another $5 million. Twin City's was an "excess" policy: Twin City had no duty to make good on the policy until the policy limits of the "primary" insurer, here Country Mutual, were reached. Hoogstraten had carried $300,000 in liability insurance, which—his negligence being conceded—was also available to pay tort claims arising out of the accident. Country Mutual retained Edward Nielsen, a Chicago lawyer, to defend the school district. He worked closely with Michael Madden, a claims attorney for Country Mutual.

Most tort suits are settled before trial. The suits arising out of the accident in this case were no exception. In August 1985, Country Mutual's Madden wrote reassuringly to Twin City, the excess insurer, that he believed that the suits could be settled at a total cost to Country Mutual of only $650,000, well below the level at which Twin City's excess policy would kick in. He believed that $250,000 would take care of the claims

by the three teenagers who had died in the accident, $200,000 would take care of Anderson, and $500,000 would take care of Faron, who had sustained brain damage. From this total of $950,000, $300,000 had to be subtracted—Hoogstraten's insurance company having tendered the full policy limits of his policy—to calculate Country Mutual's liability. The difference, $650,000, was well within its policy limit. In the following months, settlement negotiations proceeded almost as favorably as Madden had expected. By May 1986, the three death claims had been settled for a total of $300,000, of which $100,000 had been paid by Hoogstraten's insurer. That left $1 million in the pot to settle with just Anderson and Faron, whose claims, remember, had been estimated to be worth a total of $700,000. So advised, Twin City closed its claim file, believing that it would not be called upon to contribute to the settlements.

Negotiations continued with Anderson and Faron. Eventually Anderson settled for $300,000, of which Hoogstraten's insurer put up $100,000 and Country Mutual the rest. That left $700,000 in the pot. Then Hoogstraten's insurer settled with Faron for the remaining $100,000 of Hoogstraten's policy, leaving Country Mutual with $600,000 for Faron. This would have been sufficient had Madden's estimation that Faron's claim was worth only $500,000 held, especially since Faron had already received $100,000, from Hoogstraten's insurer. Yet in 1990, on the eve of trial, Nielsen recommended that Faron's claim be settled for $1 million. Country Mutual and Twin City agreed, and since only $600,000 remained of Country's Mutual's policy, Twin City was forced to ante up the difference between that and $1 million— $400,000. That is the amount it sought in this suit; why the jury shortchanged it by $64,000 is unclear, but Twin City is not complaining.

What happened to defeat Madden's original estimate of the value of Faron's claim? Nielsen's initial investigation of the accident had revealed that Hoogstraten had been speeding when he hit the bus, and it had not revealed any negligence by Nelma White, the driver of the insured's bus. The investigation had also revealed that while Faron had suffered a serious head injury, he seemed to have recovered; the psychological and cognitive impairments that he continued to complain of preexisted the accident—he had a preaccident history of drug abuse, violent behavior, learning problems, and scrapes with the law that included arrests for underage drinking, theft, and assault and battery. It was only as the date of the trial drew near that Nielsen learned that Nelma White had a history of disciplinary and safety infractions, learned that Faron had fired his original lawyer and hired an abler one, and received fresh medical evidence which revealed that Faron had suffered permanent brain damage. On the basis of this new information, only slightly offset by the fact that, Hoogstraten's estate having settled for the full policy limits, Nielsen would be able in a trial to use the "empty chair" defense—that is, blame the plaintiff's injury on the conduct of a nonparty—Nielsen persuaded the insurance companies that they would be prudent to settle for $1 million. Faron's initial demand, back in 1984, had been for $1.1 million; and on the basis of the information that Nielsen had had at that time he had regarded the demand as exorbitant. By 1990, Faron's demand had risen to $1.6 million (and this after Faron had received $100,000 from Hoogstraten's insurer), and Nielsen was now glad to be able to settle for $1 million.

In the narrative so far there is nothing to indicate any blameworthy conduct by Country Mutual toward the excess insurer. But conceivably there may have been a point during the six years of settlement negotiations in which Faron's claim could have been settled for considerably less than $1 million—for so much less in fact that Twin City would not have been required to pick up any part of the tab for the accident—and that Country Mutual had been careless in failing to seize the opportunity; stated differently but equivalently, that Country Mutual, had it been liable up to the full limit of Twin City's policy, would have been imprudent to fail to settle at that time on those terms. In arguing that Country Mutual was careless, imprudent, Twin City relies heavily on a letter Nielsen wrote Madden in 1986, evaluating the prospects for settlement. In it Nielsen,

describing a pretrial conference at which the lawyers for the various parties had been present, remarked: "Faron's attorneys were totally unreasonable. Their demand is either $500,000 or a structure of $40,000 per year for 20 years plus attorneys' fees of $125,000, $75,000 for medical bills and $75,000 for the plaintiff himself, totalling $275,000 in cash." If Country Mutual had settled with Faron for $500,000, the sum total of the settlements would not have exceeded the sum of Country Mutual's policy limit and that of Hoogstraten's insurer; Twin City would have paid nothing. Twin City persuaded the jury that Country Mutual's failure to settle with Faron on the basis described in Nielsen's letter violated the legal duty that a primary insurer owes an excess insurer to protect the latter's interests during the former's settlement negotiations with the insured's victims. Apart from Nielsen's letter, the only evidence that Country Mutual could ever have settled Faron's claim for less than $1 million is a demand for $750,000 that Faron's lawyer made early in the negotiations—but it was conditional on the school district's *not* having an excess-insurance policy, and of course it did have one. Nielsen's letter was therefore crucial evidence for Twin City. Even if Country Mutual was negligent in failing to settle sooner, without the letter Twin City's suit must fail, regardless of Country Mutual's negligence, for want of any proof of a causal relationship between a failure to settle early and Twin City's loss.

The admissibility of the letter is a hotly contested issue but one that Country Mutual argues we need not resolve if we accept its argument that a primary insurer has no duty to protect an excess insurer: that the primary insurer is not his excess insurer's keeper. Any insurer, primary or excess, has, Country Mutual concedes, a duty to his insured to avoid imprudently exposing the latter to a judgment in excess of the policy limits, *Mid–America Bank & Trust Co. v. Commercial Union Ins. Co.*, 224 Ill.App.3d 1083, 167 Ill.Dec. 199, 202, 587 N.E.2d 81, 84 (1992); *Scroggins v. Allstate Ins. Co.*, 74 Ill.App.3d 1027, 30 Ill.Dec. 682, 684, 393 N.E.2d 718, 720 (1979), but that duty is founded on the insurance contract itself, and there is, or at least in this case was, no contract between the primary and the excess insurer.

No case decided by an Illinois court holds that the primary insurer owes a duty of care directly to the excess insurer. There are hints (no more) of such a duty in a handful of cases from New York and New Jersey, *Hartford Accident & Indemnity Co. v. Michigan Mutual Ins. Co.*, 93 A.D.2d 337, 462 N.Y.S.2d 175, 178–79 (1983), aff'd, 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984); *Estate of Penn v. Amalgamated General Agencies*, 148 N.J.Super. 419, 372 A.2d 1124, 1127 (1977); *Western World Ins. Co. v. Allstate Ins. Co.*, 150 N.J.Super. 481, 376 A.2d 177, 180 (1977), but the overwhelming majority of American cases describe the duty that a primary insurer owes an excess insurer as one derivative from the primary insurer's duty to the insured. E.g., *Hartford Casualty Ins. Co. v. New Hampshire Ins. Co.*, 417 Mass. 115, 628 N.E.2d 14 (1994); *American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482–83 (Tex.1992); *Hartford Accident & Indemnity Co. v. Aetna Casualty & Surety Co.*, 164 Ariz. 286, 792 P.2d 749 (1990); *Twin City Fire Ins. Co. v. Superior Court*, 164 Ariz. 295, 792 P.2d 758 (1990); *Commercial Union Ins. Co. v. Medical Protective Co.*, 426 Mich. 109, 393 N.W.2d 479, 484–85 (1986); *Fireman's Fund Ins. Co. v. Maryland Casualty Co.*, 21 Cal.App.4th 1586, 26 Cal.Rptr.2d 762, 771–72 (1994); *Puritan Ins. Co. v. Canadian Universal Ins. Co.*, 775 F.2d 76, 79–82 (3d Cir.1985). The principal contemporary support for the idea of a direct duty comes from decisions by district judges in the Northern District of Illinois in diversity cases such as this. *American Centennial Ins. Co. v. American Home Assurance Co.*, 729 F.Supp. 1228 (N.D.Ill.1990); *Ranger Ins. Co. v. Home Indemnity Co.*, 714 F.Supp. 956, 960–62 (N.D.Ill.1989). We are not clear why these judges expect that the Supreme Court of Illinois would buck the national trend. Although Country Mutual sensibly concedes that under Illinois law as under that of other jurisdictions an excess insurer can use the doctrine of equitable subrogation to assert the insured's right to insist that his liability insurer use due care to avoid an excess judgment against the insured, there are no Illi-

nois cases on the precise point. It would be quite a leap to suppose that Illinois, not yet having confronted even the issue of derivative duty, is prepared to recognize, as few if any other states do, a direct duty of the primary insurer to the excess insurer.

■ And what exactly is to be gained by having the duty of care run directly to the excess insurer rather than indirectly, through the insured? Country Mutual tells us that since equitable subrogation is "equitable," it can be barred by an equitable defense such as equitable estoppel; and it claims that Twin City, by consenting to the $1 million settlement with Faron, is estopped to complain. But this is wrong on two counts: equitable defenses are defenses to legal as well as to equitable claims, *Maksym v. Loesch*, 937 F.2d 1237, 1247–48 (7th Cir. 1991), and Twin City's consent to the settlement—at a time when that settlement was the best available—cannot estop it to complain that Country Mutual had missed a golden opportunity to settle the case on terms that would have spared Twin City from liability. If Twin City hadn't consented and Country Mutual had gone on to lose big at trial and had then brought this suit, Country Mutual would be arguing that, by failing to agree to the $1 million settlement recommended by Nielsen, Twin City had failed to mitigate its damages.

■ The relation between insurer and insured is created by contract. A standard provision in liability-insurance contracts gives the insurer control over the defense of any claim against the insured, and an implied correlative of this right is the duty not to gamble with the insured's money by forgoing reasonable opportunities to settle a claim on terms that will protect the insured against an excess judgment. *Olympia Fields Country Club v. Bankers Indemnity Ins. Co.*, 325 Ill.App. 649, 60 N.E.2d 896, 905 (1945); *Brassil v. Maryland Casualty Co.*, 210 N.Y. 235, 104 N.E. 622 (1914); *Hilker v. Western Automobile Ins. Co.*, 204 Wis. 1, 231 N.W. 257 (1930); *Comunale v. Traders & General Ins. Co.*, 50 Cal.2d 654, 328 P.2d 198 (1958). Were it not for this duty, a duty fairly implied in the insurance contract, in a case in which a claim could be settled at or near the policy limit, yet there was a good although not certain chance that it could be beaten at trial, the insurance company would be sorely tempted to take the case to trial. For that would place it in a "Heads I win, tails you lose," position. Suppose the claim was for $2 million, the policy limit was $1 million, the plaintiff was willing to settle for this amount, but the defendant's insurer believed that if the case was tried the plaintiff would have a 50 percent chance of winning $2 million and a 50 percent chance of losing. The insurer's incentive would be to refuse to settle, since if it lost the trial it would be no worse off than if it settled—in either case it would have to pay $1 million—but if it won it would have saved itself $1 million. It is in order to quench this kind of temptation that the liability insurer's duty to settle in good faith was read into liability insurance contracts. When by virtue of an excess insurance policy the victim of the behavior that we have described is the excess insurer rather than the insured, the former is permitted to step into the shoes of the latter and assert the latter's implied contractual right against the misbehaving insurer.

■ It is true that the harm to the insured (when there is no excess insurer) is apt to be even greater than the harm to the excess insurer (when there is one in the picture), because the insured, at least if an individual, will be risk averse—that is why he buys insurance—while the insurance company eliminates risk by pooling the risks of many insureds. But the excess insurer is hurt, nonetheless, if the primary insurer takes steps that increase the probability that the excess insurer will be liable, as in our hypothetical example, where the conduct of the primary insurer converts a zero probability of liability to the excess insurer into a 50 percent probability that the latter will lose $1 million. No court has ever suggested that the difference in attitudes toward risk between an insured and an insurance company should alter the measure of recovery when an excess insurer is subrogated to an insured's claim of bad faith.

We have described the duty of good faith to the insured as an implied contractual term. But since the opposite of good faith is

bad faith, which sounds as if it might be tortious (though the duty of good faith is of course a familiar concept in contract law), since the relation between the insurer and the insured in the defense of legal claims is fiduciary in character, and since (for that reason) punitive damages are often imposed for breach of the duty of good faith settlement, many courts have recast the implied contractual duty of good faith settlement as a tort duty. See, for example, *Georgetown Realty, Inc. v. Home Ins. Co.*, 313 Or. 97, 831 P.2d 7, 9–14 (1992); *Crisci v. Security Ins. Co.*, 66 Cal.2d 425, 58 Cal.Rptr. 13, 19, 426 P.2d 173, 179 (1967); *Wolfe v. Continental Casualty Co.*, 647 F.2d 705, 709 (6th Cir. 1981) (Ohio law). Once the duty is thus preconceived, it is easy to imagine it running to any excess insurer as well as to the insured, at least if the primary insurer knows (as it did here) that there is an excess insurer in the picture. When this step is taken, the doctrine of equitable subrogation falls out of the picture. But as the Illinois legislature may have overruled the only Illinois case (*Ledingham v. Blue Cross Plan for Hospital Care of Hospital Service Corp.*, 29 Ill.App.3d 339, 330 N.E.2d 540, 544–49 (1975), overruled on other grounds; 64 Ill.2d 338, 1 Ill.Dec. 75, 356 N.E.2d 75 (1976)) to declare the insured's bad faith claim a tort, 215 ILCS 5/155; see *Mazur v. Hunt*, 227 Ill.App.3d 785, 169 Ill. Dec. 848, 592 N.E.2d 335 (1992); *Martin v. Federal Life Ins. Co.*, 109 Ill.App.3d 596, 65 Ill.Dec. 143, 151 n. 2, 440 N.E.2d 998, 1006 n. 2 (1982); but see *Emerson v. American Bankers Ins. Co.*, 223 Ill.App.3d 929, 166 Ill.Dec. 293, 298, 585 N.E.2d 1315, 1320 (1992); *Kohlmeier v. Shelter Ins. Co.*, 170 Ill.App.3d 643, 121 Ill.Dec. 288, 298, 525 N.E.2d 94, 104 (1988), this route to deriving a direct duty of the primary insurer to the excess insurer is an uncertain one in Illinois. And whether anything of any practical significance would be changed by the reconceptualization of the derivative duty as a direct one may be doubted, at least in a case such as this. While emphatic that the case should not have been brought as a direct action, Country Mutual does not complain about any of the jury instructions, even though they were based on the direct-action rather than the equitable-subrogation conception of the primary insurer's duty.

We can imagine cases in which the issue of direct versus derivative might make a difference. Suppose the insured *wanted* a trial, even though there was a danger, which materialized, of a verdict in excess of the primary insurer's policy limit. If the excess carrier's right to complain of negligence by the primary carrier is derivative, it would be barred by the insured's decision to roll the dice. *Puritan Ins. Co. v. Canadian Universal Ins. Co., supra*, 775 F.2d at 80–81. And so what? If the insured was acting irresponsibly in pressing the case to trial, the excess insurer, depending on the terms of the policy, would have a contract defense to the insured's claim against it. The duty of good faith between insured and insurer is a reciprocal one, *Transit Casualty Co. v. Spink Corp.*, 94 Cal. App.3d 124, 156 Cal.Rptr. 360, 364–65 (1979); Allan D. Windt, *Insurance Claims and Disputes: Representation of Insurance Companies and Insureds* § 5.21 (2d ed. 1988), and though some courts have had trouble seeing this, *Commercial Union Assurance Cos. v. Safeway Stores, Inc.*, 26 Cal.3d 912, 164 Cal. Rptr. 709, 713–14, 610 P.2d 1038, 1042–43 (1980) (overruling *Spink*); *International Ins. Co. v. Dresser Industries, Inc.*, 841 S.W.2d 437, 444–45 (Tex.App.1992), we have no reason to suppose that Illinois courts would suffer from this obtuseness. Given the contractual remedy of the excess insurer against the insured, why should it also have a tort duty against the primary insurer? That would place the latter in the uncomfortable position of facing a tort suit for bad faith if it settled the case and a tort suit for bad faith if it tried the case.

Should courts strain to create novel tort duties on behalf of insurance companies? Do insurance companies need the protection of tort law against their own insureds and other insurance companies? We need not answer these questions. It is enough that the arguments in favor of the direct duty are not so compelling that we could responsibly predict that the Supreme Court of Illinois would buck the national trend and declare that under the common law of Illinois a primary insurer has a direct duty, actionable in tort,

against the excess insurer. But that does not, as Country Mutual believes, end the case. We said that it has no quarrel with the instructions. How then was it prejudiced by Twin City's misnaming the claim a violation of a direct rather than a derivative duty? As there was no prejudice, this would be a perfect case for allowing (as Twin City asked us to do should we agree with Country Mutual that there is no direct duty) the complaint to be amended after judgment to correct the name of the violation charged and thus conform the pleadings to the proof, Fed.R.Civ.P. 15(b); *First National Bank of Louisville v. Continental Illinois National Bank & Trust Co.,* 933 F.2d 466, 468 (7th Cir.1991)—provided of course that Twin City had a good claim under the unexceptionable albeit mislabeled instructions. To that issue we now turn.

■ The instructions required the jury to find, if it was to bring in a verdict for Twin City, that Country Mutual had negligently forgone an opportunity to settle Faron's claim within the policy limits and thus at no cost to Twin City. (These aren't the same things, and we do not see why the question shouldn't be simply whether Country Mutual hurt Twin City by carelessly failing to settle for the lowest possible amount. See Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 7.8(d) (1988). But as there is no challenge to the instructions, we need not pursue the issue.) As some courts say, the insurer's duty (to the insured, and derivatively to any excess insurer) in settlement is to act as if there were no policy limits, e.g., *Crisci v. Security Ins. Co., supra,* 58 Cal.Rptr. at 16, 426 P.2d at 176; *Maine Bonding & Casualty Co. v. Centennial Ins. Co.,* 298 Or. 514, 693 P.2d 1296, 1299 (1985), in just the same way that a fiduciary's duty is to manage the assets or affairs of his principal as if they were his own, *Burdett v. Miller,* 957 F.2d 1375, 1381 (7th Cir.1992)—and the insurer is its insured's fiduciary when controlling the insured's defense. *Illinois Masonic Medical Center v. Turegum Ins. Co.,* 168 Ill.App.3d 158, 118 Ill.Dec. 941, 943, 522 N.E.2d 611, 613 (1988). The Illinois courts prefer to speak of it as the insurer's duty to give the insured's interest (in not having to pay an excess verdict) equal weight with the insurer's interest and as violated by negligence.

E.g., *Mid–America Bank & Trust Co. v. Commercial Union Ins. Co., supra,* 167 Ill. Dec. at 202, 587 N.E.2d at 84. It all comes to the same thing. The amount of care that is due, the amount below which the insurer is negligent, depends on all costs by whomever borne. The concept of negligence here plays its traditional role of compelling potential injurers to take account of the cost of injury to potential victims as well as to themselves in deciding how much care to take.

Country Mutual argues that a breach of the insurer's duty to act in good faith in settlement negotiations is not actionable unless, by refusing to settle, the insurer precipitates a trial that results in the entry of a judgment against the insured. This is not a ridiculous argument. If the temptation at which the duty is aimed is the temptation to gamble with the insured's money, it is not obviously a violation merely to dawdle in settling until the golden moment of opportunity passes. But though the case law is sparse, we are pretty confident that the line should not be drawn here. *Fortman v. Safeco Ins. Co.,* 221 Cal.App.3d 1394, 271 Cal. Rptr. 117, 120–21 (1990). The basic temptation of the insurer comes from the fact that its liability is capped at the policy limits, so that it can shift many of the losses of a risky strategy to the insured (or any excess insurer). It may dawdle in settling, hoping to drive a harder bargain and knowing that if it fails and the case goes to trial and it loses big, still most of the loss will fall on the insured or on an excess insurer rather than on itself. The fact that on the eve of trial it may throw in the towel because it sees no hope of winning should not excuse it from having failed to settle earlier on better terms if it would have settled earlier on those terms had all the risks of loss lain on itself.

To establish a want of care in this regard, Twin City had to prove two things. The first was that Country Mutual should have realized long before 1990 that Faron's claim was worth a lot more than $500,000. There was enough evidence of this, we may assume, to create a jury issue concerning Country Mutual's negligence. Not that Country Mutual could be blamed for Faron's having gotten an abler lawyer. But it should not have taken

six years for Nielsen to discover that Nelma White, the insured's own employee, had a record of disciplinary and safety infractions; the information had been in the personnel files of his client, the school district, all along. And Fed.R.Civ.P. 35 empowered Nielsen to conduct medical tests on Faron in whatever depth was necessary to determine the gravity of the damage to his brain. But discovering these things before 1990 would not have done Country Mutual and hence Twin City any good unless there was a chance to settle the case for $700,000 or less, for remember that the other claims settled for a total of $600,000 and there was $1.3 million in the kitty (counting Hoogstraten's insurance). The only evidence was Nielsen's 1986 letter reporting a $500,000 demand. That letter is therefore critical to Twin City's case. Country Mutual argues that the letter should not have been admitted into evidence.

■ We agree with Twin City that the letter was a business record, Fed.R.Evid. 803(6); the recording of plaintiffs' settlement demands is an essential form of record-keeping in the business of defending against tort claims. *Gibbs v. State Farm Mutual Ins. Co.*, 544 F.2d 423, 428 (9th Cir.1976). But that just made the letter admissible as evidence of what Nielsen heard in the pretrial conference of which the letter is a record; it did not make it admissible as evidence of the truth of what anyone told Nielsen in the conference, including the unnamed lawyers for Faron who made an "unreasonable" demand for $500,000. (That would be the dreaded double hearsay. E.g., *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 729 (10th Cir.1993).) None of Faron's lawyers remembers making such a demand; the letter is the only evidence.

■ There are two ways of characterizing the demand. One is merely as a statement that Faron was willing to settle the case for $500,000. Neither testimony by Nielsen himself nor Nielsen's letter would be competent evidence of the truth of such a statement about Faron's state of mind; only Faron could give competent evidence concerning his true intentions. The other characterization of the demand is as a verbal act, what philosophers of language call a performative utter-

ance, to which truth is irrelevant. When the groom in a marriage ceremony says "I do," he is not making a statement that may be true or false; he is performing an act (inessentially verbal—it could be a handshake instead) that has legal consequences; and anyone who heard his words could testify that he uttered them, without running afoul of the hearsay rule. Note of Advisory Comm. to Fed.R.Evid. 801(c); *Trustees v. Lexington Ins. Co.*, 815 F.2d 890, 904 (3d Cir.1987). That is the case here if "$500,000" was an *offer* that Nielsen heard. This may seem to depend on whether Faron's lawyer believed (whether rightly or wrongly) that Nielsen was authorized to accept it on Country Mutual's behalf on the spot, making a contract to settle the case. If the "offer" had been an offer of settlement made out of court, the presumption would be that the lawyer to whom the offer was made (Nielsen) was not authorized to accept it without consulting his client, *Kazale v. Flowers*, 185 Ill.App.3d 224, 133 Ill.Dec. 382, 541 N.E.2d 219 (1989), while if it had been an offer of settlement "in open court," the presumption would have been reversed. *Szymkowski v. Szymkowski*, 104 Ill. App.3d 630, 60 Ill.Dec. 310, 312, 432 N.E.2d 1209, 1211 (1982). In fact the settlement offer was made in a pretrial conference held as is customary in the presence of the judge. *In re Marriage of Clarke*, 194 Ill.App.3d 248, 141 Ill.Dec. 174, 550 N.E.2d 1220 (1990), though factually distinguishable, strongly suggests that this is close enough to "open court" to trigger the presumption of settlement authority—which makes a good deal of sense, since lawyers usually come to such conferences armed with settlement authority from their clients.

But even if Faron's lawyer believed that Nielsen could not accept an offer to settle without consulting his client, Country Mutual, this would not make the offer any less an offer. Most offers do not depend on instantaneous acceptance. The question is whether Faron's lawyer was making an offer that Nielsen could accept if not on the spot then within some reasonable time after which the offer would be deemed to lapse. *Kirchhoff v. Rosen*, 227 Ill.App.3d 870, 169 Ill.Dec. 884, 889, 592 N.E.2d 371, 376 (1992). Nielsen

described the $500,000 figure proposed by Faron's lawyer as a "demand," which, the trial testimony shows, plaintiffs' lawyers make only when they have authority to settle. That was enough to justify the district judge's ruling that the letter was admissible to prove a verbal act, namely an offer of settlement made by Faron's lawyer.

We admit to doubts about whether the letter is *reliable* evidence of what Country Mutual could have settled with Faron for in 1986. The letter describes the demand as either $500,000 or a "structure" seemingly worth a good deal more. The structure would have given Faron $275,000 now plus $40,000 a year for 20 years. So if Faron accepted $500,000 in lieu of the structure he would be getting an extra $225,000 now but giving up $800,000 spread over 20 years. At a discount rate of 6 percent (the T–Bill rate when the offer was made), that $800,000 would have a present value of $459,000, which is considerably greater than $225,000. So there may be a garble in the letter—some critical but subtle detail that Nielsen missed because he thought that Faron's lawyers were being "unreasonable" and therefore he may not have been listening carefully. One possibility is that the letter should be repunctuated with a comma after "20 years," implying that the alternatives were $500,000 plus $275,000 *or* $40,000 a year for 20 years plus $275,000. Then the cash alternative would be worth $775,000 and the structured alternative would have a present value of $734,000 at a 6 percent discount rate, making the structured alternative worth virtually the same amount as the cash alternative. But this interpretation can be of no comfort to Twin City, since under the instructions, which it did not challenge, it had to prove that Country Mutual could have settled Faron's case within the limits of the primary policy, and therefore for less than $700,000. For remember that the sum of the limits of Country Mutual's policy and of the Hoogstraten policy was $1.3 million, of which $600,000 was paid to the other accident victims.

But what right have we to use a 6 percent discount rate in evaluating the reliability of Nielsen's letter? There is no evidence about tort plaintiffs' (or their lawyers') time prefer-

ences. At a 10 percent rate, which is frequently used in discounting, the structured alternative would have a present value of only $616,000, which is not so far in excess of $500,000 as to negate any reasonable possibility that the offer was indeed $500,000 in cash now or a structured settlement that included $275,000 in cash now. Nielsen proceeds in the letter to characterize the cash alternative unambiguously as $500,000, and it is easy to see why he would consider it excessive, since it was greatly in excess of the settlements accepted by the other victims. Anderson settled for $300,000 (although we do not know the nature of his injuries), the claims of the three victims who had been killed came to only $300,000 in total, and at the time he wrote the letter Nielsen thought that Faron's brain injuries were largely the result of conditions and events preexisting the accident. The apparent excessiveness of Faron's demand is a further reason to suppose that Nielsen heard right when he thought he heard an offer of $500,000 in cash now, period.

■ We conclude, bearing in mind that close questions of the admissibility of evidence are resolved in favor of the district judge's call, *Winchester Packaging, Inc. v. Mobil Chemical Co.*, 14 F.3d 316, 319–20 (7th Cir.1994); *McGeshick v. Choucair*, 9 F.3d 1229, 1236 (7th Cir.1993), that Nielsen's letter was admissible in evidence and that a rational jury could conclude as it did that Country Mutual had acted negligently in failing to settle with Faron early on and by this failure had injured Twin City to the extent found by the jury.

■ Country Mutual also complains about the district judge's refusal to let it put before the jury in cross-examination an article which it characterizes as affirming the existence of a custom in the liability insurance industry that insurance companies do not sue each other over the settlement behavior of primary insurers. Such evidence might conceivably have been relevant to the question whether there is a direct duty of primary insurer to excess insurer, and we agree with Country Mutual that there is not, not in Illinois at any rate, not yet at any rate. We do not think the article could be used to

knock out the right of equitable subrogation, and anyway the existence of that right would not be an issue for a jury. Beyond all this, the article does not in fact state that there is a custom of not suing over these matters, but only that an "excess insurer shall refrain from coercive or collusive conduct designed to force a settlement," which is not a plausible interpretation of Twin City's conduct. To muddy the waters further, the article was actually offered not for these purposes but to bolster a defense of contributory negligence that has no possible merit; nor is the relevance of the article to such a defense apparent. Finally, no proper foundation was laid for the use of the article in cross-examination. It is not enough that the journal in which it appeared was reputable; the author of the particular article had to be shown to be an authority before the article could be used consistently with Fed.R.Evid. 803(18). *Meschino v. North American Drager, Inc.*, 841 F.2d 429, 434–35 (1st Cir.1988). No such showing was attempted.

The judgment of the district court, hereby modified to amend the complaint to charge Country Mutual with the breach of a derivative rather than direct duty to Twin City, is

AFFIRMED.