NOTICE

Decision filed 01/14/08. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-06-0181

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff, | ) Madison County. |
| | ) |
| v. | ) No. 00-MR-494 |
| | ) |
| AGRICULTURAL INSURANCE COMPANY, | ) |
| | ) |
| Defendant and Counterdefendant-Appellee, | ) |
| | ) |
| and | ) |
| | ) |
| AMERICAN INTERNATIONAL SPECIALTY LINES | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendant and Counterplaintiff-Appellant, | ) |
| | ) |
| and | ) |
| | ) |
| SEABOARD SURETY COMPANY, | ) Honorable |
| | ) Barbara J. Crowder, |
| Defendant. | ) Judge, presiding. |

_____

JUSTICE GOLDENHERSH delivered the opinion of the court:

Central Illinois Public Service Company (CIPS) filed an action for a declaratory judgment in the circuit court of Madison County seeking a resolution of matters regarding coverage by several insurers for an accident involving numerous plaintiffs. American International Specialty Lines Insurance Company (AISLIC), a higher-tiered excess insurer, filed a counterclaim against Great American Assurance Company, formerly known as Agricultural Insurance Company (Great American), a lower-tiered excess insurer, for negligence and bad faith in the settlement process. The circuit court dismissed the counterclaim. On review, AISLIC raises issues regarding (1) whether a lower-tiered excess

1

insurer owes any duty to a higher-tiered excess insurer to engage in meaningful settlement negotiations and (2) whether an underlying insurer still owes that duty if it could not settle the matter within its own policy limits. We reverse and remand.

FACTS

In November 1996 an elevator at the CIPS power plant in Newton, Illinois, dropped 15 floors, injuring 23 boilermakers inside, the Philbrick plaintiffs. CIPS and Dover Elevator Company (Dover) were defendants in suits brought by the boilermakers.

The parties in this appeal are excess insurers of CIPS. CIPS had several layers of insurance. Seaboard Surety Company (Seaboard) had primary insurance coverage in the amount of $5 million. Steadfast Insurance Company (Steadfast), the first-level excess carrier, provided the next $10 million. The second-level excess carrier, Great American, provided the next $15 million. The third-level excess carrier, AISLIC, provided the final $25 million of coverage.

On September 25, 2000, CIPS and Dover made a settlement offer to the first 10 Philbrick plaintiffs in the amount of approximately $20 million. Dover's insurer paid $5 million on Dover's behalf, and Seaboard and Steadfast, CIPS's primary and first-level excess insurance carriers, provided the limits of their coverage totaling $15 million.

On October 4, 2000, CIPS sent correspondence to Great American and AISLIC asking each to consent to an additional $29 million payment to settle with the remaining 13 Philbrick plaintiffs. On October 13, 2000, Great American and AISLIC agreed to fund the $29 million settlement. The parties agreed that liability for the $29 million settlement would be decided in an allocation trial between Dover and CIPS.

The allocation trial began on October 16, 2000. A jury found CIPS 95% liable for the Philbrick damages. Thus, CIPS was responsible for $27.5 million of the $29 million settlement. After posttrial motions, the trial court reduced CIPS's share, with Great American

2

still responsible for its policy limits of $15 million and AISLIC responsible for $10.325 million.

On October 12, 2000, CIPS filed a complaint for a declaratory judgment, naming each of its insurers as defendants. AISLIC filed a counterclaim against Great American for a failure to settle. AISLIC alleged Great American was negligent and acted in bad faith. AISLIC claimed that Great American ignored its demands to enter into good-faith settlement efforts or tender its policy limits so that AISLIC could resolve the matter. AISLIC brought claims under theories of a direct duty and equitable subrogation.

Great American filed a motion for a summary judgment on the counterclaim. Great American submitted affidavits from attorneys for the Philbrick plaintiffs stating the plaintiffs had not been willing to accept any settlement offer for less than the ultimate settlement amount. Great American also submitted the affidavit of a representative from Dover's insurer stating that he had rejected proposals that Dover's insurer fund any settlement with the Philbrick plaintiffs on a 50/50 basis. Attached to a supplemental motion was an affidavit from an attorney stating that she had represented CIPS regarding insurance coverage matters and that she was not aware of any offer by Dover's insurer to contribute 50% of the Philbrick settlement.

AISLIC filed a motion for leave to file a second amended counterclaim. The trial court granted leave but barred any claim that the underlying Philbrick suit could have been settled for less than $49 million. AISLIC's amended counterclaim contains four counts. AISLIC alleged bad faith and negligence under theories of direct duty and equitable subrogation. AISLIC also alleged that the allocation trial could have been resolved with Dover on a 50/50 basis or, alternatively, that the allocation trial could have been settled above Great American's policy limits on a percentage basis more favorable than a 95%/5% split.

3

Great American filed a motion to strike or dismiss the amended counterclaim. See 735 ILCS 5/2-615 (West 2000). The trial court found that AISLIC failed to state a claim under Illinois law, and the court dismissed the counterclaim. The trial court denied AISLIC's motion to reconsider, stating:

"Taking the claim as pled from AISLIC, AISLIC complains not that Great American could have settled the allocation portion of the trial within the policy limits. AISLIC seeks not only to extend Illinois law to excess insurers, but also to extend it to a duty to settle above policy limits. AISLIC's attempt to recast this claim into an argument that Great American breached a duty to tender its policy limits to AISLIC so that AISLIC could try to settle for less than AISLIC ultimately had to pay after the allocation trial is beyond a logical extension of existing law. While counsel makes an interesting argument, this court cannot create such an extension of Illinois law. The motion to reconsider is denied."

AISLIC appeals.

## ANALYSIS

### I

The resolution of this appeal requires us to address two issues. First, we must consider whether an underlying excess insurer can be liable to a supplemental excess carrier. We must also look at whether the trial court was correct in finding that any such duty only arises if the underlying excess insurer could have settled the claim within the limits of its own policy. These issues, including the definitions of the key terms involved, compound with each other and invite a lengthy discourse. To further complicate matters, Illinois courts have not directly addressed what duties an excess carrier may owe to another excess carrier.

Illinois courts have produced a significant amount of case law on the nature of excess insurers and the duties owed by insurers, but no case has yet directly discussed what duties,

4

if any, an excess insurer owes to another excess insurer. Indeed, the only case to tackle the issues of the duties of an underlying excess insurer applying Illinois law is a federal district court case. *Liberty Mutual Insurance Co. v. American Home Assurance Co.*, 348 F. Supp. 2d 940 (N.D. Ill. 2004) (memorandum opinion and order). *Liberty Mutual Insurance Co.* addressed these issues in a complex and detailed decision and provides us with a starting point to discuss Illinois law. Although *Liberty Mutual Insurance Co.* is not binding authority, the discussion provides insight into Illinois law and a framework for us to discuss the issues in this case.

The first item in *Liberty Mutual Insurance Co.* was to decide the status of the different insurers. The first tier of protection in the underlying suit was a self-insured retention held by the alleged tortfeasor. The second tier of coverage was a layer of insurance provided by American Home Assurance Company (American Home), the defendant in the declaratory action. The third tier was a layer of excess insurance provided by Liberty Mutual Insurance Company, the plaintiff in the declaratory action.

The court proceeded to address whether the second tier of coverage, provided by American Home, was primary insurance or excess insurance. The court noted that primary insurers have a duty to defend the insured because liability for a primary insurer attaches immediately upon the occurrence creating the liability for the insured, whereas liability for an excess insurer occurs only after a predetermined amount of primary insurance has been exhausted. *Liberty Mutual Insurance Co.*, 348 F. Supp. 2d at 952-53 (citing *Krusinski Construction Co. v. Northbrook Property & Casualty Insurance Co.*, 326 Ill. App. 3d 210, 219, 760 N.E.2d 530, 537 (2001), and *Royal Insurance Co. v. Process Design Associates, Inc.*, 221 Ill. App. 3d 966, 978, 582 N.E.2d 1234, 1242 (1991)). The court stated that primary policies generally impose a duty to defend, whereas excess policies only require indemnification. *Liberty Mutual Insurance Co.*, 348 F. Supp. 2d at 953. The court found

5

that American Home was an excess insurer: "It [(the alleged tortfeasor holding a self-insured retainer)] began investigating and defending the [u]nderlying [a]ction immediately after the accident, with no outside assistance from its insurance companies. American Home did not become involved in the litigation until a few weeks before the trial. Unlike a primary insurer, American Home clearly had no duty to defend the suit. Therefore, in considering the plain and ordinary meaning of the policy and the purpose of the contract, this [c]ourt concludes that American Home is an excess insurer." *Liberty Mutual Insurance Co.*, 348 F. Supp. 2d at 953-54.

*Liberty Mutual Insurance Co.* then went on to discuss the lack of precedent in Illinois regarding the duties between excess insurers. *Liberty Mutual Insurance Co.* pointed out that Illinois courts have been silent regarding the duties between two excess insurers. On the other hand, *Liberty Mutual Insurance Co.* commented that some precedents had found a direct duty from a primary insurer to an excess insurer but that other cases had doubted that duty. *Schal Bovis, Inc. v. Casualty Insurance Co.*, 314 Ill. App. 3d 562, 571, 732 N.E.2d 1082, 1090 (1999); *U.S. Fire Insurance Co. v. Zurich Insurance Co.*, 329 Ill. App. 3d 987, 1003, 768 N.E.2d 288, 300 (2002); *Twin City Fire Insurance Co. v. Country Mutual Insurance Co.*, 23 F.3d 1175, 1178 (7th Cir. 1994).

The court in *Liberty Mutual Insurance Co.* believed, as do we, that the pronouncements of Illinois courts regarding the duties of primary carriers describe the responsibilities of excess carriers. *Liberty Mutual Insurance Co.* concluded:

"This [c]ourt recognizes that comparing the duties placed on primary to excess insurers with the duties placed on excess to excess insurers is not without its difficulties. As discussed above, the differences between primary and excess insurers are well established in Illinois. [Citation.] Generally, the differences revolve around whether the insurer has a duty to defend the insured. Primary insurers often have

6

exclusive control over the defense and settlement of a case. The primary insurer hires counsel, sets the defense strategy, and controls the development of underlying facts. Despite these differences between primary and excess insurers[,] however, this [c]ourt believes that a discussion of the duties in Illinois between primary and excess insurers is probative to predict whether the Illinois Supreme Court might recognize a duty between two excess insurers." *Liberty Mutual Insurance Co.*, 348 F. Supp. 2d at 954-55.

*Liberty Mutual Insurance Co.* then presented a thorough chronological discussion of Illinois precedent on the issue of the duties of primary carriers. *Liberty Mutual Insurance Co.*, 348 F. Supp. 2d at 955-56 (citing *American Centennial Insurance Co. v. American Home Assurance Co.*, 729 F. Supp. 1228, 1232 (N.D. Ill. 1990), *Ranger Insurance Co. v. Home Indemnity Co.*, 714 F. Supp. 956, 961 (N.D. Ill. 1989), *Twin City Fire Insurance Co.*, 23 F.3d at 1178, *Schal Bovis, Inc.*, 314 Ill. App. 3d at 564, 732 N.E.2d at 1085, and *U.S. Fire Insurance Co.*, 329 Ill. App. 3d at 1003, 768 N.E.2d at 300).

Central to the discussion in *Liberty Mutual Insurance Co.* was the duty on primary insurers placed by *Schal Bovis, Inc. Schal Bovis, Inc.*, 314 Ill. App. 3d at 564, 732 N.E.2d at 1085. In *Schal Bovis, Inc.*, two primary insurers, each with policies limited to $1 million, declined to contribute their policy limits towards a proposed settlement of $2 million. A jury awarded an amount in excess of $2.8 million. Plaintiffs, including an excess insurer, filed a complaint for a declarative judgment alleging that the primary insurers were negligent because they failed to contribute to the proposed settlement. The trial court found that under Illinois law, there is no duty running from a primary insurer to the insured's excess insurer. The appellate court disagreed and found that the primary insurer owed a duty to the excess insurer through equitable subrogation. *Schal Bovis, Inc.*, 314 Ill. App. 3d at 571, 732 N.E.2d at 1090. *Schal Bovis, Inc.* also found that the primary insurer owed a direct duty to the

7

excess insurer. The court found "a three-way relationship between the policyholder, the primary insurer[,] and the excess insurer. This relationship creates reciprocal duties of care in the conduct of settlement negotiations; when a claim threatens to exceed the primary coverage, the reasonable foreseeability that the claim may reach the excess policy creates a three-way duty of care to act reasonably and in good faith in settling meritorious claims within the policy limits. The insured, primary carrier[,] and excess carriers must therefore act reasonably and in good faith towards one another in considering the others' interests in negotiating a settlement." *Schal Bovis, Inc.*, 314 Ill. App. 3d at 572, 732 N.E.2d at 1090.

*Schal Bovis, Inc.* stated that its holding was in line with federal courts' interpretation of Illinois law and with the rules in other jurisdictions. *Schal Bovis, Inc.*, 314 Ill. App. 3d at 572, 732 N.E.2d at 1091 (citing *American Centennial Insurance Co.*, 729 F. Supp. at 1231-32, *Ranger Insurance Co.*, 714 F. Supp. 956, *Hartford Accident & Indemnity Co. v. Michigan Mutual Insurance Co.*, 61 N.Y.2d 569, 574, 463 N.E.2d 608, 610, 475 N.Y.S.2d 267, 269 (1984), *Estate of Penn v. Amalgamated General Agencies*, 148 N.J. Super. 419, 424, 372 A.2d 1124, 1127 (1977), and *Vencill v. Continental Casualty Co.*, 433 F. Supp. 1371 (S.D. W. Va. 1977)).

*Liberty Mutual Insurance Co.* pointed out that other courts had expressed doubt about *Schal Bovis, Inc. Liberty Mutual Insurance Co.*, 348 F. Supp. 2d at 956-57 (citing *U.S. Fire Insurance Co.*, 329 Ill. App. 3d 987, 768 N.E.2d 288, and *Twin City Fire Insurance Co.*, 23 F.3d 1175). *Liberty Mutual Insurance Co.* concluded, "[I]n the absence of clear Illinois case law overturning the holding in *Schal Bovis*[*, Inc.*], this [c]ourt proceeds upon the theory that the direct, common law duty between primary insurers and excess insurers is still a possible legal theory in Illinois." *Liberty Mutual Insurance Co.*, 348 F. Supp. 2d at 957.

With these premises in hand, *Liberty Mutual Insurance Co.* proceeded to ask the question of whether the Illinois Supreme Court would find a direct duty running from an

underlying excess insurer to a secondary excess insurer. *Liberty Mutual Insurance Co.* upheld the summary judgment in favor of the underlying insurer.

At this point, we diverge from *Liberty Mutual Insurance Co. Liberty Mutual Insurance Co.* pronounced that Illinois law established no duty running from excess insurer to excess insurer. *Liberty Mutual Insurance Co.*, 348 F. Supp. 2d at 957. A look at *Liberty Mutual Insurance Co.* reveals that this conclusion was based on a factual distinction from *Schal Bovis, Inc.* and should not be read as a universal statement about excess insurance. The court found that American Home, an underlying excess insurer, lacked substantial control of the litigation. *Liberty Mutual Insurance Co.* found that this lack of control on the part of the underlying excess insurer precluded any duty to the secondary excess insurer. Unlike in *Schal Bovis, Inc.*, the underlying insurer lacked litigation control. This was the critical factual distinction from *Schal Bovis, Inc. Liberty Mutual Insurance Co.* concluded:

"In [*Schal Bovis, Inc.*], the primary insurers evaluated the verdict potential of the underlying claim and made the decision on their own not to settle the case. [Citation.] Such is not the case here. American Home, an 'excess' insurer, became involved in defending the [u]nderlying [a]ction less than a month before the trial started. Even then, it was Canadian National's defense attorney who tried the case before a jury and kept full control over the litigation strategy that resulted in the verdict. Control over the defense of the litigation is an important factor in deciding whether to impose a duty. In this case, even American Home's suggestion that defense counsel not recommend a number to the jury was rejected. American Home did eventually become involved in settlement discussions[;] however, under the terms of the American Home Policy, Canadian National retained the right to settle the case above its SIR and to seek reimbursement from American Home. This [c]ourt believes that, given the differences the Illinois Supreme Court has noted between the duties of

9

primary and excess insurers, it would not decide to impose a direct duty upon one excess insurer to another." *Liberty Mutual Insurance Co.*, 348 F. Supp. 2d at 958.

*Liberty Mutual Insurance Co.*, and its distinction from *Schal Bovis, Inc.*, is instructive. *Liberty Mutual Insurance Co.*'s reasoning is clear–the direct duty imposed on a primary insurer in *Schal Bovis, Inc.* was derived from the primary insurer's control of the litigation, and that duty should not be extended to an excess insurer who did not have any control in the litigation. The difficulty with *Liberty Mutual Insurance Co.* is the assumption that an excess insurer could not have control over litigation to an extent that its actions would not affect another insurer. *Liberty Mutual Insurance Co.* fails to address the circumstance that complex litigation often progresses through stages in which the involvement, or control, an insurer has in the litigation and settlement changes.

*Liberty Mutual Insurance Co.*'s analysis of what makes coverage "excess" insurance is problematic. *Liberty Mutual Insurance Co.* asserts that the differences between primary insurers and excess insurers "revolve around whether the insurer has a duty to defend the insured." *Liberty Mutual Insurance Co.*, 348 F. Supp. 2d at 954. *Liberty Mutual Insurance Co.* asserts, "Primary insurers often have exclusive control over the defense and settlement of a case." 348 F. Supp. 2d at 954. Undoubtedly, the status of an insurer as either primary or excess could affect when and how an insurer may assert control over the litigation process. See *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, No. 103588, slip op. at 10 (November 29, 2007). This, however, puts the cart before the horse. The categorization of an insurer as primary or excess is based on when coverage is triggered, which in turn affects the control of the litigation, and not vice versa. See *Kajima Construction Services, Inc.*, slip op. at 10 (providing a definition of excess insurance and discussing the triggering of coverage in the context of horizontal exhaustion).

The case at hand reveals how an excess insurer may have control over litigation in a

10

manner not foreseen by the court in *Liberty Mutual Insurance Co.* In this case, AISLIC, a higher-tiered excess insurer, alleges that Great American, a lower-tiered excess insurer, actually controlled the settlement process. AISLIC alleges Great American had the right to control the settlement negotiations and points out that Great American's insurance policy gave it the right to take control of the defense and settlement negotiations. AISLIC further alleges Great American took control over the litigation at a significant stage. AISLIC asserts that Great American possessed the right to defend CIPS and that control of the settlement process vested in Great American when the carriers below Great American settled the underlying first set of claims. AISLIC also points out that counsel for Great American sent correspondence stating that it would conduct all negotiations. AISLIC argues that Great American was, in fact, in control of the defense of the allocation trial and that AISLIC was powerless to act other than to demand that Great American settle the case or tender policy limits.

Great American counters that it did not control the litigation process. The issue of control in this case, however, is a factual question. If one accepts AISLIC's assertions, then indeed this case is distinct from *Liberty Mutual Insurance Co.*, where the lower-tiered excess insurer lacked control, and is in line with *Schal Bovis, Inc.* If the evidence supports the assertion that Great American never controlled the litigation and settlement process, then a decision in its favor is warranted. We are not in a position to make this factual determination. Because control was a question of fact, and not law, a dismissal was inappropriate.

II

A few more comments about *Liberty Mutual Insurance Co.* are in order. *Liberty Mutual Insurance Co.* found that public policy disfavored imposing a duty on the lower-tiered insurer and that a summary judgment was also appropriate on the claims made under

11

a theory of equitable subrogation. These conclusions, however, were based on a lack of control by the underlying insurer–something distinct from the case at hand. Because there are sufficient allegations that the underlying insurer exercised control in this case, the policy considerations that supported *Schal Bovis, Inc.* also favor our disposition here. *Schal Bovis, Inc.* found as follows:

"[W]e do not believe it is in the public interest to permit primary carriers to negligently or in bad faith refuse to settle claims. The recognition in Illinois of a cause of action by the excess carrier against the primary carrier promotes judicial economy because it has the effect of encouraging fair and reasonable settlements. In weighing the likelihood of injury to the excess carrier, the magnitude of the burden of guarding against that injury, and the consequences of placing the burden of negotiating in good faith upon a primary insurer, we find that the duty suggested by the plaintiffs exists in Illinois. [Citation.] Otherwise, as plaintiffs have argued, a primary insurer would have no incentive to enter into a reasonable settlement of the case when its expected liability approaches the limits of its policy. A cause of action in favor of the excess carrier is therefore in the public interest as the settlement of good-faith disputes at or near the amount of an expected judgment will be promoted, with the consequence of less litigation over disputes that logically should not be litigated, as well as the result of lower insurance premiums for excess coverage." *Schal Bovis, Inc.*, 314 Ill. App. 3d at 572-73, 732 N.E.2d at 1091.

A second set of issues on appeal involves whether Great American owed a duty if it could not settle the claim within its policy limits. The trial court erred by finding that an underlying insurer only has a duty if it is capable of settling the matter within its limits.

In cases in which an insured is exposed after the exhaustion of a primary insurance policy, the insurer's duty is tied to the possibility of a finding of liability directly against the

insured. An insurer has a duty to participate in settlement negotiations in good faith. *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 525, 675 N.E.2d 897, 903 (1996). The duty of an insurer arises when there is a reasonable probability that a recovery in excess of policy limits will expose the insured. *Haddick v. Valor Insurance*, 198 Ill. 2d 409, 417, 763 N.E.2d 299, 304 (2001). In those cases, the existence of an offer by the plaintiff to settle within the policy limits is one factor for a court to consider. *Cernocky v. Indemnity Insurance Co. of North America*, 69 Ill. App. 2d 196, 208, 216 N.E.2d 198, 205 (1966). Other factors are (1) a refusal to negotiate, (2) the advice of defense counsel, (3) the prospect of an adverse verdict, and (4) the potential for damages in excess of the policy limits. *O'Neill v. Gallant Insurance Co.*, 329 Ill. App. 3d 1166, 1173, 1175, 769 N.E.2d 100, 106-07, 108 (2002).

Great American points to language in several cases indicating that an insurer acts in bad faith only if tendering its policy limits would have settled the plaintiff's claim. In the cases cited by Great American, the insurer had either offered the policy limits in an attempt to settle or rejected a demand for the policy limits that would have resolved the matter by itself. *Adduci v. Vigilant Insurance Co.*, 98 Ill. App. 3d 472, 477, 424 N.E.2d 645, 649 (1981) (the plaintiffs indicated that they would reject the insurer's offer to settle within the policy limits); *Brocato v. Prairie State Farmers Insurance Ass'n*, 166 Ill. App. 3d 986, 990, 520 N.E.2d 1200, 1202 (1988) (the insurer offered its policy limits); *Van Vleck v. Ohio Casualty Insurance Co.*, 128 Ill. App. 3d 959, 959-61, 471 N.E.2d 925, 926-27 (1984) (the insurer provided two policies: under one policy the limits were tendered; under the other policy, no coverage was provided because of an automobile-business exclusion); *Haddick v. Valor Insurance*, 198 Ill. 2d 409, 417, 763 N.E.2d 299, 304 (2001) (an untimely tender of the policy limits); see *California Union Insurance Co. v. Liberty Mutual Insurance Co.*, 920 F. Supp. 908, 919 (N.D. Ill. 1996) (the case could have been settled within the policy limits),

13

*abrogated on other grounds by Prisco Serena Sturm Architects, Ltd. v. Liberty Mutual Insurance Co.*, 126 F.3d 886, 894 (7th Cir. 1997). These cases make clear that an insurer should not be heard to complain of the size of the judgment if it does not approach the settlement process in a meaningful manner and take advantage of a reasonable opportunity to settle. See *Van Vleck*, 128 Ill. App. 3d at 961-62, 471 N.E.2d at 927 (quoting *LaRotunda v. Royal Globe Insurance Co.*, 87 Ill. App. 3d 446, 454, 408 N.E.2d 928, 935-36 (1980)); see also *Adduci v. Vigilant Insurance Co.*, 98 Ill. App. 3d 472, 475, 424 N.E.2d 645, 648 (1981); *O'Neill v. Gallant Insurance Co.*, 329 Ill. App. 3d 1166, 1173, 769 N.E.2d 100, 107 (2002) (an insurer should not expose the financial welfare of an insured).

The discussion of policy limits in these cases is also a way of reiterating that an insurer should not be asked to perform an unreasonable task. See *Van Vleck*, 128 Ill. App. 3d at 961-62, 471 N.E.2d at 927 (quoting *LaRotunda v. Royal Globe Insurance Co.*, 87 Ill. App. 3d 446, 454, 408 N.E.2d 928, 935-36 (1980)). The duty to settle does not obligate the insurer to perform the impossible by offering more than called for by the policy. See *Van Vleck*, 128 Ill. App. 3d at 961, 471 N.E.2d at 927. In the circumstances of these cases, the requirement for a settlement within policy limits exists because such a settlement would be reasonable, whereas a demand that the insurer offer more than the policy limits would not be reasonable.

The language relied on by Great American regarding the capacity to settle the whole claim within limits does not apply to the case at hand. Assuming the truth of the allegations of the counterclaim, Great American was not asked to perform an impossible task. The factual question raised by the counterclaim is whether Great American failed to participate in settlement negotiations in a meaningful way so that AISLIC was exposed to greater damages.

14

CONCLUSION

Accordingly, the order of the circuit court is hereby reversed and the matter remanded.

Reversed; cause remanded.

STEWART, P.J., and WELCH, J., concur.

NO. 5-06-0181

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff, | ) | Madison County. |
| | ) | |
| v. | ) | No. 00-MR-494 |
| | ) | |
| AGRICULTURAL INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant and Counterdefendant-Appellee, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN INTERNATIONAL SPECIALTY LINES | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant and Counterplaintiff-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SEABOARD SURETY COMPANY, | ) | Honorable |
| | ) | Barbara J. Crowder, |
| Defendant. | ) | Judge, presiding. |

---

**Opinion Filed**: January 14, 2008

---

**Justices**: Honorable Richard P. Goldenhersh, J.

Honorable Bruce D. Stewart, P.J., and
Honorable Thomas M. Welch, J.,
Concur

---

**Attorneys for Appellant**: G. Keith Phoenix, Michael E. Bub, Sandberg, Phoenix & von Gontard, P.C., One City Centre, 15th Floor, St. Louis, MO 63101-1880 (attorneys for American International Specialty Lines Insurance Co.)

---

**Attorneys for Appellee**: Roger K. Heidenreich, Deborah C. Druley, Sonnenschein, Nath & Rosenthal, LLP, One Metropolitan Square, Suite 3000, St. Louis, MO 63102; Robert C. Johnson, Sonnenschein, Nath & Rosenthal, LLP, 7800 Sears Tower, Chicago, IL 60606 (attorneys for Agricultural Insurance Company)