**CALIFORNIA UNION INSURANCE COMPANY, Plaintiff,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Defendant.**

No. 93 C 6262.

United States District Court, N.D. Illinois, Eastern Division.

March 28, 1996.

See also, 1996 WL 111882.

---

Sonia Victoria Odarczenko, Margaret J. Orbon, Clausen, Miller, Gorman, Caffrey & Witous, P.C., Chicago, IL, Michael James Baughman, Chicago, IL, for plaintiff California Union Insurance Company.

Algimantas P. Kezelis, French, Kezelis & Kominiarek, P.C., Chicago, IL, Robert A. Kezelis, French, Kezelis & Kominiarek, P.C., Chicago, IL, for defendant Liberty Mutual Insurance Company.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This case stems from a successful underlying suit by Robert Hauck for serious personal injuries against (among others) Central Telephone Company of Illinois ("CTI") and its parent company, Centel Corporation. Defendant Liberty Mutual Insurance Company was the primary insurance carrier for Centel. Plaintiff California Union Insurance Company provided excess insurance. Following a multimillion-dollar jury verdict for Hauck that required both insurance companies to contribute, California Union brought this action against Liberty Mutual, claiming that Liberty Mutual's negligent and bad faith refusal to settle the case within Liberty Mutual's policy limits had obligated California Union to pay the excess verdict. California Union and Liberty Mutual have filed cross-motions for summary judgment, which are the subject of this Order and Opinion.

### RELEVANT FACTS

■ We begin by describing in some detail the course of the underlying litigation, because those events are at the heart of the question here: whether, as a matter of law, Liberty Mutual should have made greater efforts to settle the underlying case, and whether such efforts would have spared California Union from having to pay almost $4 million under its excess insurance policy. The following facts are gleaned from the parties' respective Local General Rule 12 statements of material facts and accompanying exhibits.[1]

1. Local Rule 12(M) requires a party moving for summary judgment to file "a statement of material facts as to which there is no genuine issue." The movant's 12(M) statement must contain "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." In response, Local Rule 12(N)(3)(a) permits the non-moving party to file a concise response to the movant's statement. In the case of any disagreement, the nonmoving party's 12(N)(3)(a) statement must include specific references to supporting materials that allegedly establish a factual dispute. Pursuant to Local Rule 12(N)(3)(b), the nonmoving party may also submit a statement of "additional facts that require the denial of summary judgment," with respect to which the moving party may respond.

Robert Hauck, a roofer, sustained severe and permanent injuries when the top of his head came into contact with a sagging 7,200 volt power line while he was inspecting a roof. (California Union's Rule 12(M) statement of undisputed facts ("CU's 12(M)") ¶ 6; Liberty Mutual's amended Rule 12(M) statement of undisputed facts ("LM's Am. 12(M)") ¶ 1.) He suffered severe electrical burns to his head, face and legs; he lost a portion of his skull, necessitating the use of a plastic helmet over the top of his head to protect his brain; he lost his right ear; and he required cataract surgery in both eyes as a result of the accident. (CU's 12(M) ¶ 9 & Ex. TT; LM's Am. 12(M) Ex. C at LM03901.) He also became a quadriplegic. (CU's 12(M) ¶ 9.) Hauck was hospitalized for 13 months, had multiple surgeries, and was permanently disabled. (Id. ¶ 9 & Ex. TT; LM's Am. 12(M) Ex. C at LM03901.) The accident resulted in lost wages of $600,000–$700,000, past medical expenses of $500,000, and anticipated future medical expenses of $50,000 annually. (CU's 12(M) ¶ 8; LM's Am. 12(M) ¶ 44.)

Hauck filed suit in 1987 against several defendants, including Commonwealth Edison, which provided electrical service to the property; the business that operated at the property; and the owner of that business. (LM's Am. 12(M) ¶ 3 & Ex. B at 1–2.) Later that year, Hauck filed a second amended complaint adding Centel and CTI as defendants.[2] (Id. ¶¶ 3–4.) CTI provided the telephone service to the property where Hauck was injured, and CTI employees had performed work on the utility poles in the area. (Id. ¶ 5 & Ex. B at 9–10.) All defendants cross-claimed against each other. (Id. ¶ 20.)

Hauck retained the Chicago law firm of Corboy & Demetrio. (CU's 12(M) ¶ 7.) Thomas A. Demetrio of that firm represented him in settlement negotiations and ultimately tried the case. (Id. ¶ 10.) Demetrio and his firm were (and are) known as very skilled plaintiffs' personal injury attorneys. During the spring of 1990, Demetrio obtained a new "high" jury verdict of more than $22 million in a personal injury case involving a quadriplegic plaintiff. (CU's Rule 12(N) response to LM's Am. 12(M) statement ("CU's 12(N) Resp.") Ex. LLL at LM01826.[3]) This record replaced the previous high of over $16 million obtained by Demetrio and his partner Philip H. Corboy, Jr. in November 1988. (Id.) Hauck's initial settlement demand in 1988 was $37.5 million from all defendants. (CU's 12(M) ¶ 32; LM's Am. 12(M) ¶ 13.)

Centel and CTI were insured by a number of insurers. (LM's Am. 12(M) ¶ 7.) Liberty Mutual provided the primary coverage of $1 million as well as the first $1 million of excess coverage. (Id.) California Union provided the second layer of excess coverage in the amount of $4 million. (Id. ¶ 8.) There were also several layers of excess insurers above California Union. (CU's 12(M) ¶ 18.)

As the primary insurer, Liberty Mutual defended Centel/CTI in the action brought by Hauck, retaining the law firm of Wildman, Harrold, Allen & Dixon for this defense. (Id. ¶ 14.) Liberty Mutual's claims handlers for the matter were Barbara Standiford, who handled many of the day-to-day responsibilities as the case proceeded through discovery

The Court is not obligated to scour the record in search of factual disputes. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). The mere denial of a particular fact without specific references to supporting material that allegedly establish a factual dispute is insufficient; and, where a factual assertion is met with such a naked denial, the fact may be deemed admitted. *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994). The Court may, and in this case does, adopt and strictly enforce the local rules, deeming all properly supported factual allegations that are not properly controverted as being admitted. *See id.; Stewart v. McGinnis*, 5 F.3d 1031, 1034 (7th Cir.1993).

Because Liberty Mutual has failed on several occasions to comply with the dictates of Local Rule 12, we have stricken some of its Rule 12 statements, and deemed the corresponding facts stated by California Union to be admitted. *See* this Court's Order of March 8, 1996. Also, where Liberty Mutual's Rule 12(N)(3)(a) responses to California Union's Rule 12(M) statement of facts failed to properly controvert the statements, we have deemed those facts to be admitted.

2. Centel was dismissed from the case in early 1989.

3. Numbers beginning with "LM" are Bates numbers assigned during document production by Liberty Mutual, and are used herein where necessary to identify specific pages within an exhibit.

and to trial; Jack Bickford, to whom Standiford reported; and Kevin Racine in Liberty Mutual's home office, who received reports from Standiford and Bickford, provided direction, set reserves, and responded to settlement requests. (*Id.* ¶¶ 11–13.)

Rebecca Gilman was the risk manager at Centel from 1987 to 1993 and, as such, was the primary liaison with Centel's defense counsel and insurers' representatives regarding the *Hauck* case. (*Id.* ¶ 16; LM's Am. 12(M) ¶ 10.) Gilman testified that there was no evidence to support the initial claims against CTI/Centel in the second amended complaint, which alleged that CTI had been negligent by relocating and/or disturbing the location of power lines and/or telephone poles too close to a structure. (LM's Am. 12(M) ¶ 12 & Ex. A at 8.)

The complaint was amended twice more before going to trial, however. (CU's 12(N) Resp. ¶¶ 3, 9, 12.) The fourth amended complaint included allegations that CTI had a duty to examine the premises when it was in the area and to warn the property owners of any sagging power lines. (CU's Rule 12(N)(3)(b) statement of additional facts requiring the denial of summary judgment ("CU's Add'l Facts") ¶ 4.) The allegations regarding a general duty to warn concerned Gilman. (*Id.*) From the beginning, Liberty Mutual's attorneys consistently evaluated the case has having the potential for a jury verdict for Hauck between $10 million and $20 million, regardless of the liability of individual defendants. (CU's 12(M) ¶ 23; CU's Add'l Facts ¶ 9.)

In January 1989, Liberty Mutual's defense attorneys wrote Liberty Mutual that liability remained uncertain at that time. (CU's 12(M) Ex. DDD.) One of the possible defense strategies, joining forces with the other co-defendants to present a united front against Hauck (or develop a cooperative strategy regarding settlement) appeared unlikely. (*Id.*) Defense counsel noted that the focus of the co-defendants seemed to be "attempting to deflect liability onto the telephone company." (*Id.*)

California Union was notified by February 1989 that the liability from the *Hauck* matter could reach into California Union's layer of coverage. (LM's Am. 12(M) ¶ 29.) Initially, California Union set a reserve of $500,000 for the claim. (*Id.* ¶¶ 33–34.) California Union also hired monitoring counsel, Conklin & Roadhouse, in the summer of 1989. (*Id.* ¶ 30.) In his role as monitoring counsel, John Roadhouse watched the case, reviewed discovery and depositions (although he never attended depositions), and appeared at pretrial conferences to represent California Union's interests. (LM's Am. 12(M) Ex. Q at 13, 28; CU's 12(M) Ex. CCC at 13–15.)

In July 1989, defense attorneys prepared an analysis of the case which noted three theories of liability against CTI: (1) that CTI had at some point removed a guy wire from one of the utility poles (pole 1), allowing the power line to sag where it crossed the roof Hauck inspected; (2) that a guy wire CTI installed on another pole (pole 2) caused that pole to lean, which allowed the power line to sag; and (3) that CTI owed a general duty to the public to observe dangerous conditions such as the sagging power line when it was working in the area, and report them to someone—either the power company or the landowner. (LM's Am. 12(M) Ex. B at 12–19.) The first theory was being investigated, but at that point, there was no evidence establishing that a guy wire had ever existed on pole 1 or been removed by CTI. (*Id.* at 13–16.) An expert retained by CTI was able to refute the second theory. (*Id.* at 16.)

As for the general duty theory, there was no Illinois case law that imposed such a duty on a telephone utility. (*Id.* at 18.) Nevertheless, the attorneys noted that the general duty argument had "jury appeal." (*Id.* at 17.) CTI had been working in the area several days prior to the accident. (*Id.* at 13.) The attorneys also noted other facts that could be used against CTI:

Employees from Central Telephone were at or near the property on numerous occasions over the years, both on routine service calls and on larger jobs. In 1967 and 1975, Central Telephone employees had to climb the power poles, including pole number 2, to perform their work. Because Central Telephone had its equipment on the same poles that housed electric power lines, the parties may contend that Central

Telephone should have observed the condition of the poles and height of the power lines and Central Telephone should have reported this dangerous condition either to the customer or to Commonwealth Edison.

The Centel System Practices manual states, in effect, that Centel employees are required to report all "non-standard trouble conditions" to their supervisors. The supervisors, in turn, are to report the problem to the appropriate utility or other entity. ... The plaintiff and co-defendants have expressed an enormous amount of interest in this document.

(*Id.* at 17–18.) The attorneys noted, however, that CTI employees had not been instructed to perform general safety inspections of the service area, nor was it clear that the CTI workers who had been at the site in 1967 and 1975 would have been able to see the sagging line through the foliage surrounding pole 2. (*Id.* at 19.)

About that time, Bickford wrote the home office that "[w]e do feel from the evidence that they will probably not find us responsible for the leaning of the electrical wires," although he also felt that CTI was "highly unlikely to get a complete pass" on liability. (CU's 12(M) Ex. U.) Bickford noted that the verdict value was estimated in the $10 to $20 million range, and that CTI could possibly be found responsible for 50% of that, along with Commonwealth Edison. (*Id.*) Bickford also noted that the various defendants were fighting among themselves, each pointing the finger at the other in terms of liability, a situation that helped Hauck. (*Id.*)

In a letter to Bickford in December 1989, James Dineen of Liberty Mutual's home office characterized the *Hauck* case as a "serious case with serious potential and with a very competent plaintiff's attorney." (*Id.* Ex. C.) On CTI's liability, he noted that "I still question our involvement but I have no doubt that a fact question can be made as to Centel's negligence." (*Id.*) Because of that and the "horrendous" nature of the plaintiff's injury, he felt that all of the defendants ought to "sit down, discuss the merits of each one's position, see what we think would be a fair settlement price, and then make recom-

mendations based upon these discussions." (*Id.*)

In the meantime, Liberty Mutual made efforts to get rid of the "general duty" theory against CTI, which it viewed as raising primarily legal rather than factual issues. (LM's Am. 12(M) Ex. C at LM03902.) Accordingly, CTI filed a motion for summary judgment, arguing that as a matter of law it had no duty under Illinois law to observe or notify anyone of the sagging power line. (CU's 12(M) ¶ 22.) The motion was denied in January 1991 (*id.* Ex. S), leaving Liberty Mutual and CTI with the prospect of facing a jury on all of the theories advanced against them.

On March 7, 1991, Standiford wrote Liberty Mutual's home office that CTI's co-defendants still showed no signs of cooperating in a joint defense strategy, and that in fact Commonwealth Edison continued to target CTI in an effort to shift the blame for the sagging power lines. (CU's 12(M) Ex. A.) Standiford believed that "our insured has a great deal of exposure," and specifically quantified CTI's exposure at 30%. (*Id.*) On the possibilities for settlement, Standiford noted that it was "difficult to state what the total settlement value is": the demand was still $37.5 million, and Hauck "has given no indication that [he is] interested in settlement and actually he has stated that they want this to go to a jury. ... I seriously doubt that he will consider settlement for anything much less than 20 million." (*Id.*) Nevertheless, Standiford thought it would be a "good idea to see what we could possibly do to attempt settlement before the case goes to trial. I think that it would show good faith on behalf of Liberty to have attempted settlement in [a] case of this magnitude. ... I think if settlement is going to be explored before trial, there is no doubt that Liberty will have to tender its policy limits of $1 million along with its excess policy of $1 million." (*Id.*) However, in May 1991 Standiford wrote CTI that Liberty Mutual had no plans to tender its $2 million policy limits toward settlement of the case. (*Id.* Ex. F.)

On August 30, 1991, California Union raised its reserves from $500,000 to the full policy limits of $4 million based on the advice

of Roadhouse, the attorney who had been monitoring discovery. (LM's Am. 12(M) ¶ 36.) An accompanying internal California Union memorandum noted that "[t]he liability of [CTI] is circumstantial, at best." (*Id.* Ex. W.) Nevertheless, California Union believed it prudent to reserve the policy limits. (*Id.*)

Discovery efforts intensified as the fall 1991 trial date approached. On September 9, Liberty Mutual's attorneys reported deposition testimony by one of Hauck's experts that affected CTI's potential liability on the first theory (that CTI had removed a guy wire on pole 1 that allowed the power line to sag). (CU's 12(M) Supp.Ex. VVV.) The expert, a metallurgist, opined that tests showed conclusively that a guy wire had at one time been attached to the pole and had been removed in a manner consistent with an orderly, intentional removal. (*Id.*) The attorney noted that there was no evidence as to *who* removed the guy wire, or when. (*Id.*) Nevertheless, the tests foreclosed CTI's argument that there had never been a guy wire on pole 1. (*Id.*)

On September 13, Racine in Liberty Mutual's home office wrote a status memorandum noting that Liberty Mutual's summary judgment motion had been denied; that "liability damages are serious and present substantial exposure"; that one co-defendant (the property owner) was believed to have struck a deal with Hauck; and that the insured, the excess insurer, and Liberty Mutual's branch office had all requested that Liberty Mutual tender its $2 million policy limits in an effort to settle the case. (*Id.* Ex. BB.) The memorandum also stated that "We believe liability is arguable." (*Id.*) The memorandum noted that third party witnesses (lawn cutters) could testify that since 1978, no guy wire had existed on pole 1. (*Id.*)

On September 18, Hauck had stated in writing that his demand had been reduced to $16 million from all defendants. (LM's Am. 12(M) ¶ 14.) The same day, Liberty Mutual's claims handlers met with its defense attorneys, its insured, and the excess insurance carriers. (CU's 12(M) Ex. FFF at LM03864.) As summarized by one of the excess carriers, everyone was concerned about Liberty Mutual's ability to settle the case. (*Id.* Ex. J at LM03854.) Liberty Mutual advised that it had no plans to tender its policy limits toward settlement. (*Id.* Ex. FFF at LM03864.) The next day Roadhouse, on behalf of California Union, formally demanded that Liberty Mutual make its $2 million available for purposes of settlement. (*Id.* Ex. H.) Standiford advised the home office that California Union was prepared to contribute to a settlement but would not do so until Liberty Mutual exhausted its limits. (*Id.* Ex. FFF at LM 03865.)

Commonwealth Edison's motion for summary judgment was denied on September 20. (*Id.* Ex. LLL.) Shortly thereafter, Commonwealth Edison asked the court to delay the trial date slightly in order to schedule a pretrial settlement conference on September 27. (*Id.* Ex. J.) Gilman at CTI contacted Standiford to see if Liberty Mutual had "reviewed its decision" not to tender its limits toward settlement and to request that it do so. (*Id.* Ex. DD.) She was informed that there was no change. (*Id.*) Gilman then requested written explanation for Liberty Mutual's position. (*Id.*) CTI was worried because its own documents showed that a guy wire had at one time been attached to pole 1, but later documents showed no guy wire, and there was no explanation in the documents for how or when the guy wire was removed. (*Id.* Ex. KK at 23–24.) CTI was also worried that a verdict against it could establish negative precedent on the issue of the duty owed by telephone companies to report dangerous conditions. (CU's Add'l Facts ¶ 4.)

On September 25, Liberty Mutual's attorneys wrote to Standiford, summarizing developments in the case and asking for authority to settle the case. (*Id.* Ex. T.) The attorneys noted that Hauck's experts would testify that the sagging of the power line was caused by the lack of a guy wire on pole 1 and by an improper guy wire attached to pole 2, both of which could be laid at CTI's door. (*Id.*) .There was no doubt that the guy wire for pole 2 had been attached by CTI. (LM's Am. 12(M) Ex. B at 16.) As for pole 1, one of Hauck's experts would testify, based on photographic evidence, there was indeed a guy wire in place on pole 1 in 1966;

that the guy wire was removed at some point after that, likely by a CTI employee during the removal of telephone lines from pole 1 in 1967; and that the power line that ran between poles 1 and 2 was several feet higher in 1966 than on the date of the accident. (CU's 12(M) Ex. T at LM01501.) Alternatively, Hauck's counsel would argue that even if CTI did not remove the guy wire on pole 1, CTI should have noticed the leaning of the poles when it worked in the immediate area in 1967 and 1985, and should have reported the dangerous condition to someone. (*Id.*) CTI's own expert, Frank Denbrock, would testify that CTI had a duty to report a leaning pole, at least during the time (up until 1967) that CTI had a telephone cable on pole 1. (*Id.* at LM01502.) Finally, one of the experts would testify that the trench created near pole 1 by CTI's 1985 work could retain water, eroding the soil and causing the pole to lean further. (*Id.* at LM01501.)

Defense counsel believed that this testimony might be sufficient to allow a jury to infer that CTI deliberately removed the guy wire or otherwise caused the poles to lean. (*Id.*) As the case was to be tried under a pure comparative negligence theory, Hauck would not be barred from recovery even if he was found to be more than 50% at fault. (*Id.* ¶ 28.) Thus, it was quite possible that CTI would end up being liable for damages in the case.

Immediately before the settlement conference on September 27, defense counsel requested settlement authority from Liberty Mutual. (*Id.* Ex. F.) Counsel noted that the other defendants appeared to be preparing to settle; that, in several previous conversations and meetings, he had informed Liberty Mutual of the "strong likelihood that a jury may render an adverse verdict against Central Telephone alone"; and that such a verdict would exceed Liberty Mutual's policy limits. (*Id.*) Defense counsel had been told that "Liberty Mutual understood this, but wanted to proceed to trial anyway." (*Id.*) Indeed, on September 18 and at several points thereafter, Liberty Mutual had told the defense attorney that "it will not offer any money to settle this action," and advised him to convey that message to Hauck's counsel and the court. (*Id.*) The defense counsel nevertheless stated that, "in our view, Liberty Mutual should offer its $2 million policy to the plaintiffs" in an effort to settle the case." (*Id.*) On September 21, Standiford had also requested $1.5 million in authority to settle from the home office, stating that the case would definitely settle for the full policy limits of $2 million. (*Id.* Ex. EE.) Liberty Mutual gave its defense counsel no authority to make any settlement offer at the September 27 conference. (*Id.* Ex. J at LM03854.)

At the continuation of the pre-trial settlement conference on September 30, it was announced that all defendants except CTI had settled with Hauck over the weekend for a total of $4.4 million. (*Id.* Ex. E at LM01769.) One of CTI's excess carriers wrote to Liberty Mutual to request it to make a "serious settlement offer," urging that, in light of the other defendants' dismissals from the case and the impending trial date, the window of opportunity for settlement was then. (*Id.* Ex. J at LM03854.) Liberty Mutual offered $400,000 to settle the matter. (*Id.* Ex. EE.) That offer was rejected. (*Id.*) That same day, defense counsel advised that for a settlement to be reached, Liberty Mutual would have to tender its $2 million limit and that a contribution from excess carriers would likely also be required. (*Id.* Ex. VV.)

The pre-trial conference was continued again, to October 1. (*Id.* Ex. NN.) The only parties remaining in the case at that point were Hauck and CTI. (*Id.*) Demetrio represented Hauck at this conference. (*Id.* Ex. GG at 10.) Bickford appeared on behalf of Liberty Mutual. (*Id.* Ex. NN.) Several of the excess carriers continued to urge Liberty Mutual to tender its policy limits in pursuit of settlement, one of them noting that "the numbers being discussed by Commonwealth Edison strongly indicate that this case can be settled with Liberty Mutual's limits." (*Id.* Ex. L at LM01747.)

Going into this meeting, Bickford had $850,000 in authority to settle the matter. (*Id.* Ex. NN.) At the conference, Bickford offered $800,000. (*Id.*) Judge O'Connell advised that a settlement would exceed Liberty Mutual's primary policy limits. (*Id.* Ex. G.)

Bickford stated that he "was not prepared to offer anything close to the $2 million policy limits" and reoffered the $800,000. (*Id.* Ex. NN.) This offer was rejected. (*Id.*)

In his deposition for this case, Demetrio stated that he told Judge O'Connell that he wanted a total settlement package of $6 million from all defendants for his client. (*Id.* Ex. GG at 12.) (The other defendants had already provided $4.4 million, leaving Liberty Mutual's required contribution at $1.6 to $2 million.) (*Id.*) Demetrio testified that, upon being pressed by Judge O'Connell, Bickford refused to negotiate further, stating that "the offer was $800,000 to the plaintiffs and it would never be any more." (*Id.* at 13.)

A trial date was then set. (*Id.* Ex. NN.) After this conference, CTI wrote to Liberty Mutual that "[w]e believe your willingness to try the case before a jury is unrealistic and unsound." (*Id.* Ex. K.) CTI demanded that Liberty Mutual put up its entire $2 million policy limits, advising that if a jury verdict was rendered in excess of $2 million, CTI would look to recover any excess paid by CTI. (*Id.*)

On October 2, 1991, Hauck issued a written demand of $8 million to CTI. (*Id.* Ex. FF.) This was the lowest formal demand issued by Hauck before the trial. (LM's Am. 12(M) ¶ 17.) Liberty Mutual did not respond to this demand, and did not attempt to proceed further with settlement before the trial started. On October 3, Liberty Mutual responded to CTI's request for a written explanation of its reluctance to settle, stating only that "Liberty Mutual feels it is necessary to proceed to trial on this questionable liability case." (CU's 12(M) Ex. HH.) On the other hand, Liberty Mutual also noted that it was also attempting to put together a high-low package offer. (*Id.*)

As the case approached the date of trial, Liberty Mutual requested authority from California Union to use some of California Union's $4 million for a high-low agreement, which it ultimately offered to Demetrio on October 8, 1991, the day after the trial started. (*Id.* Exs. II, JJ.) The high-low agreement (which was in addition to the $4.4 million for the contributions from other defendants) offered a low of $500,000 and a

high of $4 million, including $2 million of Liberty Mutual's money and $2 million of California Union's money. (*Id.* Ex. II.) The high-low agreement required the parties to try the case, but limited the risk of a bad verdict: Hauck would be guaranteed $500,000 even if he received little or no damages from the jury, but could recover no more than $4 million even if the jury awarded him more. (*Id.*)

Roadhouse believed that the high-low agreement would backfire, but California Union agreed to offer its money "in an effort to settle this case and protect the interests of Centel." (*Id.* Ex. CCC at 99–100; Ex. II.) California Union expressly reserved its rights to take action against Liberty Mutual for bad faith in refusing to settle, however. (*Id.* Ex. II.) Demetrio did not respond to the high-low offer, which he later characterized as "insulting." (*Id.* Ex. GG at 17.)

Demetrio tried the case solely against CTI, which he called "the most culpable party." (*Id.* at 10.) The jury returned a verdict in favor of Hauck for $16,038,737, reduced by 40% for Hauck's own negligence. (*Id.* Ex. WW.) The court, after hearing post-trial motions, permitted a setoff for the prior settlements in the amount of $4.4 million. (LM's Am. 12(M) ¶ 19.) (This figure had been disputed.) One month after the verdict, California Union reached an agreement with Hauck requiring it to contribute $3,723,242. (*Id.* ¶ 20.) Liberty Mutual also contributed its $2 million policy limits. (*Id.*)

Liberty Mutual has submitted statistics showing the relative frequency of defense jury verdicts versus plaintiffs' jury verdicts in Cook County during the twelve months beginning September 1, 1991 and ending August 31, 1992, the same time during which this trial took place. In that period, a total of 757 civil cases were tried to a jury in Cook County (including state and federal courts). (*Id.* Ex. X.) Of these cases, 415 resulted in verdicts for the plaintiff, 308 verdicts were for the defendant, and 34 juries deadlocked. (*Id.*) Of the 415 plaintiffs' verdicts, seven verdicts exceeded $6.4 million. (*Id.*) The *Hauck* case was one of them.

California Union brought this suit against Liberty Mutual claiming that Liberty Mutual negligently and in bad faith breached its obligation to settle the *Hauck* case within policy limits, thereby obligating California Union to pay the excess verdict. Both parties have moved for summary judgment.

## LEGAL STANDARDS

■ Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all the evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not significantly probative or merely raises "some metaphysical doubt as to the material facts," summary judgment may not be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Flip Side Prods., Inc. v. Jam Prods., Ltd.,* 843 F.2d 1024, 1032 (7th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In making its determination, the Court's sole function is to determine "whether there is any material dispute of fact that requires a trial." *Waldridge v. American*

*Hoechst Corp.,* 24 F.3d 918 (7th Cir.1994). Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

■ Where, as here, cross-motions for summary judgment have been submitted, the court is not obliged to grant judgment as a matter of law for one side or the other. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993). The court must evaluate each party's motion on its own merits, resolving all factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Id.; Buttitta v. City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd,* 9 F.3d 1198 (7th Cir.1993).

## ANALYSIS

■ Illinois recognizes a cause of action for the negligent or bad faith refusal of an insurer to settle a claim within policy limits when that refusal exposes the insured to a judgment in excess of the policy limits.[4] *Steele v. Hartford Fire Ins. Co.,* 788 F.2d 441, 442 (7th Cir.1986). Because the insurer generally has the right to control the defense of any litigation against the insured under the liability insurance policy, the insurer owes the insured a corresponding duty of care to conduct the litigation so as to avoid harming the insured—particularly, "a duty not to gamble with the insured's money by forgoing reasonable opportunities to settle a claim on terms that will protect the insured against an excess judgment." *Twin City*

---

**4.** Ordinarily, it is the insured who bears the cost of a verdict in excess of amount of the primary insurance policy. Where, as here, the insured has excess insurance, however, it is the excess insurer who bears the cost of the excess verdict, and thus the excess insurer that may seek recovery for its losses. The theory that allows such a claim by an excess insurer is equitable subrogation, which allows an excess insurer to step into the shoes of the insured. Although Illinois courts have not conclusively addressed the viability of the equitable subrogation theory, the Seventh Circuit has held that Illinois law would

permit an excess insurer to pursue a claim against the primary insurer based upon equitable subrogation. *See Twin City Fire Ins. Co. v. Country Mut. Ins. Co.,* 23 F.3d 1175, 1178–79 (7th Cir.1994).

California Union initially advanced two theories of liability against Liberty Mutual: a direct duty theory and an equitable subrogation theory. On July 11, 1994, California Union voluntarily dismissed the direct duty theory in light of the Seventh Circuit's decision in *Twin City,* which found that the Illinois supreme court would not adopt the direct duty theory. *Id.*

*Fire Ins. Co. v. Country Mut. Ins. Co.*, 23 F.3d 1175, 1179 (7th Cir.1994).

 "Where the insurer fails to settle a case within policy limits through fraud, negligence or bad faith,[5] this duty is breached" and a cause of action exists. *Adduci v. Vigilant Ins. Co.*, 98 Ill.App.3d 472, 475, 53 Ill.Dec. 854, 857, 424 N.E.2d 645, 648 (1st Dist.1981). The insurer may then be held liable for the entire judgment, regardless of the policy limits. *Id.*

 As a preliminary matter, we address some general arguments raised by the parties in their briefs. First, Liberty Mutual argues that California Union's claim against it should be barred through the operation of equitable estoppel—in essence, that California Union caused the harm of which it now complains. The basis for this argument is that California Union retained an attorney, Roadhouse, to monitor the case and report to it. Liberty Mutual claims that the presence of Roadhouse at the pretrial settlement conferences "altered the negotiating landscape" because it signaled Hauck's attorney that the excess carrier was concerned by the case, and therefore that more money might be forthcoming.

 The case law does not support Liberty Mutual's contention that, by hiring counsel to monitor a case, an excess insurer is estopped to complain of the result obtained by the primary insurer. An excess insurer can be estopped from recovery if its own actions induced the defendant to try the case. *See Sanders v. Standard Mut. Ins. Co.*, 142 Ill.App.3d 1082, 1084–85, 97 Ill.Dec. 258, 259, 492 N.E.2d 917, 918 (4th Dist.1986). Likewise, if an excess insurance carrier participates in settlement negotiations and approves the settlement amount, it may have waived its right to challenge the settlement later. *See Commercial Union Ins. Co. v. Medical Protective Co.*, 136 Mich.App. 412, 356 N.W.2d 648, 653 (1984), *aff'd*, 426 Mich.

109, 393 N.W.2d 479 (1986).[6] Neither of those situations exists here, and the mere hiring of monitoring counsel does not create equitable estoppel. *See Certain Underwriters of Lloyd's v. General Accident Ins. Co.*, 699 F.Supp. 732, 741 (S.D.Ind.1988), *aff'd*, 909 F.2d 228 (7th Cir.1990) ("[a] showing of some affirmative, misleading conduct" is required for estoppel).

 Second, Liberty Mutual argues that California Union has no viable claim because it "suffered no damage": it set reserves at the full amount of its policy ($4 million), and the amount it was required to pay in satisfaction of the jury verdict was a little less than that. Liberty Mutual cites no support for the novel theory that an excess insurer's act of setting reserves waives the duty of care to avoid an excess verdict which the primary insurer owes to the insured. Under Illinois law, if a primary insurer breaches its duty to its insured or an excess insurer, the excess verdict itself constitutes damages: "[t]he fact of the entry of the excess judgment against the insured itself constitutes the damage that permits the insured to recover for breach of the duty owed." *Scroggins v. Allstate Ins. Co.*, 74 Ill.App.3d 1027, 1030, 30 Ill.Dec. 682, 684, 393 N.E.2d 718, 720 (1st Dist.1979).

 California Union also raises a general argument in support of its own motion for summary judgment: that to prevail at trial Liberty Mutual must have an expert witness, which it does not have because California Union has moved to strike the expert it did have. Aside from the fact that this argument incorrectly assumes that we will grant California Union's separate motion to strike the expert, the argument also fails because there is no requirement of expert testimony in failure-to-settle cases. The cases California Union cites for that proposition do not support it. Accordingly, none of

---

**5.** Illinois courts require only that negligence or bad faith be shown; fraud is not necessary. In this context, "bad faith" is more similar to negligence, in that it means being unfaithful to the duty owed. *Cernocky v. Indemnity Ins. Co.*, 69 Ill.App.2d 196, 205–06, 216 N.E.2d 198, 203 (2d Dist.1966).

**6.** *But see Twin City Fire Ins. Co. v. Country Mut. Ins. Co.*, 23 F.3d 1175, 1179 (7th Cir.1994) (excess insurer that agreed to contribute to a settlement not estopped from bringing suit against the primary insurer for failure to settle lower).

these preliminary arguments [7] is persuasive.

■ Before we turn our consideration to the evidence surrounding the claim itself, there is one final matter. In researching the issues raised by the parties in their motions, we became concerned about the possible effect of an Illinois statute that provides for certain penalties against insurers, 215 ILCS § 5/155, and asked the parties for additional briefing on this issue. After receiving the parties' briefs and researching the issue, we conclude that § 155 applies only to an insurer's failure to settle a claim of coverage by the insured against the insurer, not to the insurer's failure to settle a claim brought against the insured by a third party. *See National Union Fire Ins. Co. v. Continental Illinois Corp.*, 673 F.Supp. 267, 271 (N.D.Ill. 1987). As this case is in the latter category, § 155 does not apply. We thus turn to the arguments regarding the failure-to-settle claim itself.

California Union argues that there is no genuine question of material fact that would prevent judgment in its favor on this cause of action. In contrast, Liberty Mutual claims that the evidence supporting several of the elements of this cause of action is missing, so that no reasonable jury could find for California Union. We examine each element separately, beginning with the duty owed.

■ Illinois courts have generally formulated the duty owed by the insurer as requiring the insurer "to give its insured's interests at least equal consideration with its own where the insured is a defendant in a suit in which the recovery may exceed [the] policy limits." [8] *Adduci v. Vigilant Ins. Co.*, 98 Ill.App.3d 472, 475, 53 Ill.Dec. 854, 857, 424 N.E.2d 645, 648 (1st Dist.1981). This duty is a fiduciary duty, *Kavanaugh v. Interstate Fire & Cas. Co.*, 35 Ill.App.3d 350, 356, 342

N.E.2d 116, 120 (1st Dist.1975), and is often framed in terms of a concern for fairness:

> If an opportunity appears to settle within the policy limits, thereby protecting the insured from excess liability, the insurer must faithfully consider it, giving the insured's interest at least as much respect as its own. The insurer need not submit to extortion; it may reject a bad deal without waiving the protection the policy limit gives it against the vagaries of lawsuits. But if the honest and prudent course is to settle, the insurer must follow that route. If it deviates from that course, it will be liable for the whole judgment, so as to give the insured the protection that the policy was intended to provide.

*LaRotunda v. Royal Globe Ins. Co.*, 87 Ill. App.3d 446, 454, 42 Ill.Dec. 219, 225–26, 408 N.E.2d 928, 935–36 (1st Dist.1980).

Liberty Mutual does not contest that it owed CTI (and thus, via equitable subrogation, California Union) a general duty to use due care to avoid an excess judgment. Liberty Mutual does, however, contest whether it owed California Union a specific duty under Illinois law to initiate settlement negotiations. The parties also dispute whether the duty to initiate settlement negotiations is applicable here.

■ Upon reviewing the case law, this Court concludes that the duty to initiate settlement negotiations is a specific aspect of the general duty of care which an insurer owes to the insured in certain circumstances. Ordinarily, an insurer owes no duty to make an offer to settle a case which it is defending. *Adduci*, 98 Ill.App.3d at 478, 53 Ill.Dec. at 858, 424 N.E.2d at 649. Where, however, "the probability of an adverse finding on liability is great and the amount of probable damages would greatly exceed the [primary]

---

7. In addition to the above two arguments, Liberty Mutual suggests that the statements of its employees regarding settlement efforts and strategies are not admissible under Rule 408 of the Federal Rules of Evidence, which prohibits the admission of evidence of offers to compromise. This argument is meritless, as the Rule itself states that such evidence is admissible "for another purpose," including in subsequent actions to show bad faith by an insurer. *See Civic Fed. Sav. Bank v. Hanover Ins. Co.*, No. 91 C 8286,

1992 WL 188409 at *2 (N.D.Ill. July 29, 1992) (citing cases).

8. As would be expected, this duty to consider the interests of the insured does not arise until the recovery sought exceeds the policy limits. *Cernocky*, 69 Ill.App.2d at 206, 216 N.E.2d at 204. It is not disputed that the recovery sought by Hauck would exceed Liberty Mutual's policy limits of $2 million.

coverage," the insurer may owe a duty to initiate settlement negotiations if the plaintiff has not done so. *Kavanaugh v. Interstate Fire & Cas. Co.*, 35 Ill.App.3d 350, 356, 342 N.E.2d 116, 121 (1st Dist.1975). The duty to initiate settlement should be imposed sparingly, only when the liability is "glaring," as it places an insurer at a disadvantage in negotiating shared by no other litigant. *Adduci*, 98 Ill.App.3d at 478, 53 Ill.Dec. at 858–59, 424 N.E.2d at 649–50.

■ The duty to initiate settlement does not directly apply here. Instead, this case involves the related duty to continue ongoing settlement discussions. Hauck's counsel himself initiated settlement negotiations with demands that ranged from $37.5 million in 1989 to $8 million shortly before trial. Hauck never closed the door, or indicated that he would not entertain other offers. Liberty Mutual was not in the position feared by the courts in *Adduci* and *Kavanaugh*, where the insurer is forced to make offers in a negotiating void, putting it at a strategic disadvantage. Here, Hauck's attorney began the negotiating process and demonstrated receptiveness to counter-offers. Although Hauck's demands were high, he never indicated that he was not prepared to reduce them in order to settle; in fact, Hauck's demands became lower over time, a clear signal that he was willing to settle. In this situation, Liberty Mutual's duty was not to initiate settlement but merely to act reasonably in continuing the negotiations, including making reasonable offers up to the limits of its policy if that was necessary and prudent.

■ We find that the element of a duty owed by Liberty Mutual has been established. The key question is, of course, whether Liberty Mutual breached its duty to make reasonable efforts to settle the case.

On the element of breach, Liberty Mutual contends that there is no question that it fulfilled its duty of due care in its handling of settlement negotiations—that its negotiating stance was indisputably reasonable. Conversely, California Union argues that it is indisputable that Liberty Mutual breached its duty. Liberty Mutual focuses on factors that would tend to limit the amount Hauck was likely to recover—such as Hauck's low previous earnings (less than $10,000 per year) and age (49 years old at the time of trial)—and the fact that Hauck was already assured of receiving an amount more than four times his special damages [9] through his settlement with other defendants even before adding in whatever amount he received from CTI.

California Union points to many other factors that were (or should have been) part of Liberty Mutual's calculus in determining what settlement offers were appropriate. At a minimum, these included the permanent and catastrophic nature of Hauck's injuries, the sympathy potentially generated in a jury by the sight of those injuries, and the impressive track record of Hauck's attorneys in obtaining substantial personal injury verdicts. We do not hold that factors such as the severity of the plaintiff's injuries or the skill of the opposing attorneys should dictate whether an insurer chooses to settle or defend a case. Nevertheless, these factors affect the insurer's chances of a successful outcome, and should reasonably have been considered by Liberty Mutual in calculating the risks of taking the *Hauck* case to trial.

More important, as time went on evidence accumulated that seriously undermined Liberty Mutual's arguments against liability, diminishing its chances to prevail on the merits at trial. Although there was no Illinois case law imposing a specific duty on CTI to observe and warn of dangerous conditions created by another utility, summary judgment on this issue had been denied, CTI's own expert admitted that the regulatory code applicable to CTI imposed a duty to warn of dangerous conditions at least during the time that CTI had lines attached to pole 1, and Liberty Mutual's defense attorneys had noted that this theory had jury appeal. On

---

9. This argument apparently relies on a rule of thumb often used by local attorneys to get a rough estimate of the total value of a run-of-the-mill personal injury case: a multiple of the special (out-of-pocket) damages, *e.g.*, three times "specials." Liberty Mutual has presented no evidence that the *Hauck* case was a run-of-the-mill case, or that anyone, including Liberty Mutual's own employees, ever thought this method applied to the case.

another front, CTI's argument that there never was a guy wire attached to pole 1 had been refuted by expert testimony. Nor could CTI hope to escape liability through a finding that Hauck was more than 50% responsible for the accident; the case was being tried under pure comparative liability.

Even if Liberty Mutual innocently misapprehended the importance of all of these factors, it admittedly received strong signals from all sources—its insured, the excess insurers, its own defense attorneys and claims handlers, and the judge in the case—that "the probability of an adverse finding on liability [was] great and the amount of damages would exceed the policy limits," *Phelan v. State Farm Mut. Automobile Ins. Co.*, 114 Ill.App.3d 96, 104, 69 Ill.Dec. 861, 867, 448 N.E.2d 579, 585 (1st Dist.1983), requiring Liberty Mutual under Illinois law to make good faith efforts to settle within its $2 million policy limits. As discussed below, we find that no reasonable jury could find otherwise than that Liberty Mutual breached this duty.

Liberty Mutual argues that it had no sign that the plaintiff would have taken an offer of $2 million in settlement, especially as the last formal demand it received was $8 million, a much higher amount. We agree that Liberty Mutual could not have been certain in advance that its policy limits would do it, but that is the nature of settlement negotiations. The salient fact is that Liberty Mutual never attempted to find out whether the case would settle for some amount over $800,000—which was only 40% of its policy limits—and still within its $2 million limits. Given that its own claims handler had expressed optimism that the case could settle within policy limits, Liberty Mutual's failure to explore settlement further was a breach of its duty of care.

Liberty Mutual also argues that it did in fact tender its policy limits—as part of the high-low agreement. Yet, the circumstances surrounding the high-low offer show that it too was unreasonable. The low end was only $500,000 more than the plaintiff had already received, demonstrating a serious underestimation of the remaining value of the case by Liberty Mutual in light of the above factors. Plus, the agreement would require Hauck's

attorneys to try the case, so they would have to expend the same amount of effort and expense, but whatever success they achieved would be limited to the "high" of $4 million. Finally, the timing of the "offer" was critical. This belated "offer" was made while the trial was already underway. By the time the high-low offer was made, the plaintiff had already done all of his pre-trial preparation, had obtained substantial settlements from other defendants, and had little to lose by continuing to try the case. At that point, he could not reasonably have been expected to limit his potential recovery through such an agreement.

After weighing the undisputed facts surrounding Liberty Mutual's settlement efforts, we find that California Union is entitled to summary judgment on the issue of breach. The requirements for Liberty Mutual to meet its obligations of due care were both clear and fair. "The insurer need not submit to extortion; it may reject a bad deal without waiving the protection the policy limit gives it against the vagaries of lawsuits. *But if the honest and prudent course is to settle, the insurer must follow that route.*" *LaRotunda*, 87 Ill.App.3d at 454, 42 Ill.Dec. at 225–26, 408 N.E.2d at 935–36 (emphasis added).

Liberty Mutual argues that CTI's liability was not clear, and thus that it had the right to try the *Hauck* matter. But once Liberty Mutual's motion for summary judgment was denied, the likelihood that CTI would be held legally liable at trial substantially increased. That likelihood went up even further in early September, as tests by the plaintiff's expert showed that a guy wire had at one time been connected to a pole used by CTI and had been deliberately removed, and it became clear that Hauck's experts as well as the experts of CTI's co-defendants would point to CTI as the culpable party. Liberty Mutual's defense attorneys themselves believed that the evidence would allow a jury to find CTI liable, and urged settlement. Certainly by then, all of the objective evidence, other than Liberty Mutual's unreasonable beliefs, mandated that the "honest and prudent course" would be to engage in serious settlement conversations with Hauck's counsel. Moreover, Hauck's counsel had indicated a

willingness to discuss settlement by consistently lowering his demands, even after the other defendants settled and were dismissed from the case. Liberty Mutual's own claims handlers believed that the case was ripe for settlement by the last week or two prior to the start of the trial, and thought that Liberty Mutual could "definitely" settle within its policy limits.

Nevertheless, despite all of these developments, Liberty Mutual unreasonably failed to implement any serious settlement strategies. Instead, Liberty Mutual's home office consistently displayed a poor grasp of the factors involved in the case, although the relevant information in many cases had been in its files for years, and an inability to adopt a coherent approach to settlement. Liberty Mutual has produced no evidence that CTI, its own claims handlers, or its defense attorneys believed that the chances of winning on liability at trial were good, and that its low settlement offers were thus part of a deliberate strategy to achieve victory at trial. Instead, the clear message Liberty Mutual received from all of its objective sources was that CTI would likely be found liable and that Liberty Mutual should seek to settle the case by tendering its policy limits. Liberty Mutual's consistent actions demonstrate that, in fact, it was willing to forgo trial and settle, as long as it could do so very cheaply. In light of the downhill trend of events—the denial of summary judgment, the accumulation of additional evidence supporting the plaintiff's theories of liability, and the settlement by the other defendants—and the factors demonstrating a good window of opportunity to settle at the time of the pre-trial conferences, Liberty Mutual's decision to offer only 40% of its policy limits before trial started was reckless gambling with others' money that reflects a willful disregard for the risks faced by CTI in going to trial and a failure to develop a coherent settlement strategy.

Under the circumstances of this case, no reasonable trier of fact could conclude that Liberty Mutual's actions in pursuing the settlement of the *Hauck* case were reasonable. We are mindful of our duty not to substitute our judgment for that of the trier of fact, and to draw all the inferences in favor of the non-movant in the context of summary judgment. Nevertheless, in this case there is virtually no evidence that Liberty Mutual indeed pursued settlement in a manner that would have satisfied its duty, giving its insured's interests equal weight with its own, *Adduci,* 98 Ill.App.3d at 475, 53 Ill.Dec. at 857, 424 N.E.2d at 648, or acting as it would have had Liberty Mutual had been liable for the entire damages, *Twin City,* 23 F.3d at 1181. In a case where the potential damages were great (Liberty Mutual's own defense counsel consistently warned of the likelihood of a jury verdict of $10 to $20 million), there is no question but that Liberty Mutual's actions in pursuing settlement failed to meet the duty of care it owed to CTI, and hence, via equitable subrogation, to California Union.

Liberty Mutual's arguments in opposition to summary judgment have focused on the legal arguments discussed above: that, as a matter of law, it need not have sought settlement because liability was not clear, and that it did in fact make some offers, which satisfied its obligations. For the reasons stated above, we reject those arguments. Liberty Mutual has not countered the great bulk of the factual matters presented by California Union in support of its motion for summary judgment, including the mass of correspondence and notes authored by its own agents and attorneys. These admissions demonstrate conclusively that Liberty Mutual was aware of factors which should have induced a reasonable, prudent insurer to make serious attempts to settle, including making offers up to the policy limits. Liberty Mutual's failure to do so, which appears to have been the result of indecision and recklessness rather than part of a deliberate trial strategy, was not reasonable or prudent conduct in light of all the circumstances. Thus, we hold that California Union has successfully established Liberty Mutual's breach of its duty of care.

■■■ In order to prevail, the excess insurer must show not only the duty to settle and a breach of that duty, but that the failure to settle within policy limits proximately caused the excess insurer harm by having to contribute money to the verdict or settlement. *See National Union Fire Ins. Co. v.*

*Continental Illinois Corp.,* 673 F.Supp. 267, 273 (N.D.Ill.1987). To establish proximate cause, the Illinois courts require that the claim could actually have been settled within the policy limits. *See Brocato v. Prairie State Farmers Ins. Ass'n,* 166 Ill.App.3d 986, 990, 117 Ill.Dec. 849, 852, 520 N.E.2d 1200, 1203 (4th Dist.1988) ("cases dealing with a failure to settle within policy limits also include the element that the cases could have been settled within those limits").

█ Liberty Mutual argues that it cannot be held responsible for failing to settle within policy limits because it never received a "firm, unconditional demand" that was within those limits. However, whether a demand was ever made within the insurer's policy limits is only one factor to be considered in light of all the surrounding circumstances in determining whether the insurer was guilty of negligence or bad faith. *Cernocky v. Indemnity Ins. Co.,* 69 Ill.App.2d 196, 209, 216 N.E.2d 198, 205 (2d Dist.1966). Demetrio has testified that he would have accepted a settlement offer from Liberty Mutual of $1.6 to $2 million, within the policy limits. Demetrio specifically stated that he told Judge O'Connell that he wanted a total settlement of $6 million from all defendants for his client. As Demetrio's testimony is uncontroverted by any other evidence, we are obliged to deem this fact established. In addition, Liberty Mutual's claims handler Standiford advised it shortly before trial that putting its policy limits on the bargaining table would definitely settle the case.

█ By presenting this evidence, California Union has proffered sufficient evidence to withstand Liberty Mutual's motion for summary judgment. The next question is whether California Union should receive summary judgment in its favor. Liberty Mutual does not challenge any of the evidence on which California Union relies to show proximate cause—Demetrio's testimony and the statements by Liberty Mutual's claims handlers. Its sole argument, that it had received no firm demand that was within its limits, we have already disposed of. Under Illinois law, proximate cause exists when a wrongful act contributes in any degree to an injury, if that injury is the natural or probable result of the act. *See generally* Illinois Pattern Jury Instruction Civil (IPI) 15.01 (3d ed. 1990 &

Supp.1993). Here, even drawing all factual inferences in favor of Liberty Mutual, we find that Liberty Mutual has failed to raise a genuine issue of material fact as to whether its failure to act reasonably in the *Hauck* settlement negotiations was a proximate cause of the excess verdict paid by California Union.

California Union has established the elements of duty, breach and proximate cause on its cause of action, and Liberty Mutual has failed to raise a genuine issue of material fact as to any of these elements, even when all reasonable inferences are drawn in favor of Liberty Mutual. Accordingly, we grant California Union's motion for summary judgment.

## CONCLUSION

For all of the foregoing reasons, we grant California Union's motion for summary judgment [48–1], and deny Liberty Mutual's amended motion for summary judgment [66–1]. Judgment is entered in favor of California Union in the amount of $3,723,242.00, plus interest and costs pursuant to FED. R.CIV.P. 54(d)(1).